Vern BICKEL, Jerald Weskalnies and Charles Allen Wright, III, Plaintiffs/Appellants,

v.

CITY OF BOULDER, Boulder Valley School District RE–2 and County of Boulder, Defendants/Appellees.

No. 94SA130.

Supreme Court of Colorado, En Banc.

Sept. 12, 1994.

As Modified on Denial of Rehearing Oct. 11, 1994.

Certiorari Denied Feb. 21, 1995.

See 115 S.Ct. 1112.

Kevin B. Pratt, Colorado Springs, for plaintiffs/appellants.

Kutak Rock, Cassandra G. Sasso, Robert D. Irvin, Michael R. Johnson, Timothy M. Jones, Denver, Office of City Atty., Joseph N. de Raismes, III, Alan E. Boles, Jr., H. Lawrence Hoyt, Boulder Co. Atty., Madeline J. Mason, Deputy Co. Atty., Boulder, for defendants/appellees City of Boulder and Boulder County.

Caplan & Earnest, Gerald A. Caplan, Richard E. Bump, Alan J. Canner, Boulder, for defendant/appellee Boulder Valley School Dist. RE–2.

Kenneth G. Bueche, David W. Broadwell, Denver, for amicus curiae Colorado Mun. League.

Hall & Evans, Thomas J. Lyons, Denver, for amicus curiae Colorado Counties, Inc.

Lauren B. Kingsbery, Denver, for amicus curiae Colorado Ass'n of School Boards.

J. Evan Goulding, Denver, for amicus curiae Sp. Dist. Ass'n of Colorado.

Justice MULLARKEY delivered the Opinion of the Court.

Plaintiffs, citizens and taxpayers of the City and the County of Boulder, brought this action [1] against defendants City of Boulder (City), County of Boulder (County) and Boulder Valley School District RE–2 (School District, and, collectively, the governmental entities) seeking declaratory and injunctive relief and the invalidation of several ballot issues proposed by the defendants and ultimately adopted by the electorate at the November 2, 1993, general election. Plaintiffs claimed that the ballot issues in question violated several provisions of Article X, Section 20 of the Colorado Constitution, also known as "Amendment 1." The trial court disagreed, however, and granted the City's and the County's motions for summary judgment and the School District's motion to dismiss plaintiffs' claims. We affirm the trial court's rulings in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

I

The facts relevant to our disposition of this appeal are not in dispute.

*School District Question 1*

In the fall of 1993 the School District distributed a "NOTICE OF ELECTION TO INCREASE TAXES/TO INCREASE DEBT" to all registered voters within its

---

1. This action was originally brought by plaintiffs as two separate actions. After the trial court ruled against them in both actions, plaintiffs timely filed notices of appeal with the court of appeals. We exercised certiorari jurisdiction prior to judgment in the court of appeals and consolidated the two appeals for disposition in this court. *See* § 13–4–109, 6A C.R.S. (1987); C.A.R. 50.

boundaries. That election notice contained the ballot titles for two proposed initiatives, summaries of written comments for and against those initiatives, and the School District's recent fiscal spending year information. The ballot title for the first issue, "School District Question 1," reads in relevant part:

SHALL BOULDER VALLEY SCHOOL DISTRICT RE2'S DEBT BE INCREASED $89,000,000 WITH A REPAYMENT COST OF $166,290,620 (WHICH IS THE MAXIMUM PRINCIPAL AND INTEREST OVER THE LIFE OF SUCH DEBT) AND SHALL BOULDER VALLEY SCHOOL DISTRICT RE2'S TAXES BE INCREASED $10,862,540 ANNUALLY FOR THE PAYMENT OF SUCH DEBT AND ANY REFUNDINGS THEREOF (THE "BONDS"), ALL FOR THE PURPOSE OF CONSTRUCTING, ERECTING, ACQUIRING ... OR MAKING ADDITIONS TO ANY SCHOOL BUILDING, AND ACQUIRING, PURCHASING OR IMPROVING SCHOOL GROUNDS ... AND SHALL THE BONDS BE GENERAL OBLIGATIONS OF THE DISTRICT ...; AND IN CONNECTION THEREWITH, (I) SHALL THE DISTRICT'S AD VALOREM PROPERTY TAXES BE INCREASED IN ANY YEAR IN AN AMOUNT SUFFICIENT TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS WHEN DUE, WITHOUT LIMITATION AS TO RATE OR AMOUNT OR ANY OTHER CONDITION EXCEPT AS STATED ABOVE, AND (II) SHALL THE PROCEEDS OF THE BONDS, AND THE REVENUES FROM SUCH TAXES ... BE COLLECTED AND SPENT WITHOUT LIMITATION OR CONDITION, AND WITHOUT LIMITING THE COLLECTION OR SPENDING OF ANY OTHER REVENUES OR FUNDS BY THE DISTRICT, UNDER [AMENDMENT 1] OR ANY OTHER LAW?[2]

Five days prior to the election, plaintiffs filed suit in the Boulder County District Court claiming that School District Question 1 violated Amendment 1 by (1) seeking approval of a "consolidated" debt and tax increase; (2) seeking approval of "unlimited general obligation bonds"; (3) seeking to exempt the School District from "future voter approval of tax rate increases"; (4) failing to include the "text" of the ballot issue in the election notice; and (5) failing to include in the election notice a proper estimate of the School District's "first full fiscal year spending." The plaintiffs' complaint sought declaratory and injunctive relief for these alleged violations.[3] On election day, a majority of the voters answered School District Question 1 in the affirmative.

In granting the School District's motion to dismiss plaintiffs' claims, the trial court found that School District Question 1 did not constitute a "consolidation" of ballot issues in violation of subdivision 3(a) of Amendment 1. The court instead ruled that Question 1 contained a permissible combination of two related subjects, the incurrence of debt and the collection of taxes to repay that debt, in the same ballot issue. It also found that School District Question 1 did not violate subdivision 4(a) of Amendment 1 because that section does not specifically prohibit "voter approval at a given election of mill levy increases in

---

**2.** The School District's second question on the ballot for the November 1993 election, proposing a $36,000,000 increase in the School District's debt and a $4,341,660 annual increase in taxes to repay that debt, was not adopted by the electorate and thus is not relevant to our disposition of this case.

**3.** The plaintiffs' prayer for relief requested, *inter alia:*
(i) "a declaration that bonded debt ballot issues may not be consolidated with other ballot issues" and a "permanent injunction against such consolidation in future elections"; (ii) "a declaration that ballot titles must comply fully with [Amendment 1]" and a "permanent injunction against the use of ballot titles which do not comply"; (iii) "a declaration that election notices must comply fully with [Amendment 1]" and a "permanent injunction against the use of election notices which do not comply"; (iv) "a declaration that districts may not evade the election requirements of [Amendment 1 section] 4" and a "permanent injunction against submission of such evasions in future elections"; and (v) "a declaration that the results of this election wherein the unconstitutional and illegal ballot titles, ballot questions and requests were used are invalid and without effect."

years beyond the year immediately following the election." Finally, the trial court found that the School District "substantially complied" with all of the election notice requirements imposed by Amendment 1 and that none of the plaintiffs' alleged violations "could possibly have affected the election result."

### City Question B

Plaintiffs have challenged only two of the nine issues placed on the November 1993 ballot by the City. Both of these issues were approved by a majority of the electorate. The first ballot issue challenged by plaintiffs, City Question B, proposes that the City grant a franchise to Public Service Company of Colorado, Inc. (Public Service) to sell and distribute gas and electricity to the City and its residents. Plaintiffs claim that City Question B violates subdivision 3(c) of Amendment 1 because it "seeks a tax increase" yet its ballot title does not begin with the words "SHALL (DISTRICT) TAXES BE INCREASED...." The ballot title for City Question B reads in relevant part:

> SHALL THE CITY OF BOULDER GRANT A FRANCHISE TO PUBLIC SERVICE COMPANY OF COLORADO TO FURNISH, SELL AND DISTRIBUTE, GAS AND ELECTRICITY TO THE CITY AND TO ALL PERSONS, BUSINESSES, AND INDUSTRIES WITHIN THE CITY AND THE RIGHT TO MAKE REASONABLE USE OF ALL STREETS AND OTHER PUBLIC PLACES AND PUBLIC EASEMENTS AS MAY BE NECESSARY; AND IN CONNECTION THEREWITH, IN THE EVENT OF UNCOLLECTABILITY, SHALL CITY TAXES BE INCREASED BY UP TO EIGHT MILLION DOLLARS BY DEEMING THE FRANCHISE FEE TO BE AN OCCUPATION OR A SALES AND USE TAX, AND SHALL THE CITY BE PERMITTED TO COLLECT, RETAIN, AND EXPEND THE FULL PROCEEDS OF SUCH TAX, NOTWITHSTANDING ANY STATE RESTRICTION ON FISCAL YEAR SPENDING, INCLUDING WITHOUT LIMITATION THE RESTRICTIONS OF [AMENDMENT 1]?

The trial court initially noted that the "application of [Amendment 1] to a ballot issue dealing primarily with something other than taxes, but containing authorization for a future tax contingent on unlikely future events, raises intriguing issues." It rejected plaintiffs' claim, however, because they failed to allege that the omission of the words "SHALL (DISTRICT) TAXES BE INCREASED" at the beginning of the ballot title could have affected the outcome of the election. It also noted that the ballot title for City Question B "did comply with the requirements of [Amendment 1], and that [the City] accurately described the issues on which the voters were asked to pass judgment."

### City Question C

Plaintiffs also claim that City Question C, which proposes to increase the City's debt by $50,000,000 through the issuance and payment of bonds for the purpose of acquiring open space real property, violates several provisions of Amendment 1.[4] Prior to the election, the City distributed an election notice to all registered voters which included the ballot title for City Question C and a summary of the comments for and against the measure which were filed with the election officer. That ballot title reads in relevant part:

> SHALL CITY OF BOULDER DEBT BE INCREASED UP TO $50,000,000 WITH A REPAYMENT COST OF UP TO $150,000,000 (SUCH AMOUNT BEING THE

---

**4.** On August 17, 1993, the Boulder City Council passed Ordinance No. 5584, authorizing the City to seek voter approval to issue up to $50,000,000 in bonds for the express purpose of acquiring open space real property. In that Ordinance, City Council noted that Section 97 of the Charter of the City of Boulder, enacted by the voters in 1971, permits the City to issue bonds to acquire open space real property without prior voter approval, provided that any such acquisition is payable from sales and use taxes earmarked and committed for that purpose and that the bonds are secured by the full faith and credit of the City. However, because it was uncertain whether Section 97 of the Charter constituted the type of "voter approval" required by Amendment 1, City Council determined to seek further voter approval at the November 1993 election.

TOTAL PRINCIPAL AND INTEREST THAT COULD BE PAYABLE OVER THE MAXIMUM LIFE OF SAID DEBT) BY THE ISSUANCE AND PAYMENT OF BONDS OF THE CITY FOR THE PURPOSE OF CONTINUING THE ACQUISITION OF OPEN SPACE REAL PROPERTY OR INTERESTS THEREIN, AS PREVIOUSLY AUTHORIZED BY A VOTE OF THE PEOPLE IN 1971, IN A PRINCIPAL AMOUNT NOT TO EXCEED $50,000,000 OR SUCH LESSER AMOUNT AS IS PERMITTED FROM TIME TO TIME BY SECTION 97 OF THE CITY'S CHARTER ... SUCH BONDS TO BE PAYABLE FROM SALES AND USE TAX REVENUES EARMARKED AND COMMITTED FOR SUCH PURPOSES BY VOTE OF THE CITY'S ELECTORS AND BY A PLEDGE OF THE FULL FAITH AND CREDIT OF THE CITY AS AUTHORIZED IN THE CITY'S CHARTER, WHICH AUTHORIZATION SHALL INCLUDE AUTHORIZATION TO REFUND SUCH BONDS AND REFUNDING BONDS WITHOUT ADDITIONAL VOTER APPROVAL; AND IN CONNECTION THEREWITH (I) SHALL CITY OF BOULDER AD VALOREM PROPERTY TAXES BE INCREASED IN ANY YEAR IN AN AMOUNT SUFFICIENT TO PAY THE PRINCIPAL OF AND INTEREST ON SUCH BONDS AND REFUNDING BONDS WHEN DUE, WITHOUT LIMITATION AS TO RATE OR AMOUNT OR ANY OTHER CONDITION EXCEPT AS STATED ABOVE, AND (II) SHALL THE PROCEEDS OF SUCH BONDS AND REFUNDING BONDS AND THE REVENUES FROM SUCH TAXES AND ANY EARNINGS FROM THE INVESTMENT OF SUCH PROCEEDS AND REVENUES BE COLLECTED AND SPENT WITHOUT LIMITATION OR CONDITION ... UNDER [AMENDMENT 1 OR ANY OTHER LAW]?

Plaintiffs argued in the trial court that City Question C violated Amendment 1 by (1) seeking approval of a consolidated debt and tax increase; (2) failing to state a dollar amount of the proposed ad valorem tax increase; (3) seeking to exempt the City from future voter approval of bond refunding and tax increases; and (4) failing to provide adequate information about City Question C in the election notice. The City filed a counterclaim, requesting a declaratory judgment from the trial court that City Question C complied with Amendment 1 because the bonds and taxes described in that ballot question had been previously approved by a vote of the electorate in 1971. *See supra* note 4. The trial court rejected each of plaintiffs' claims.[5] To the extent these claims mirrored the claims made by plaintiffs against School District Question 1, the trial court incorporated its findings from that prior order. As to plaintiffs' "consolidation" argument, the trial court specifically found that City Question C "presented the voters with precisely one issue" and that to interpret Amendment 1 as plaintiffs suggest "defies common sense and flies in the face of all accepted standards for constitutional interpretation."

### County Question A

The final ballot issue challenged by plaintiffs is County Question A, a lengthy proposal seeking authorization for the County to increase taxes by $6.5 million annually through the imposition of a 0.25% sales and use tax and for the County to issue up to $40 million in bonds payable solely from such sales and use tax revenues, all for the express purpose of acquiring and maintaining trails and open space real property. This question was answered in the affirmative by a majority of the voters in the November 1993 election. The

---

**5.** The trial court made its order in favor of the City a "final judgment" for purposes of C.R.C.P. 54(b). Plaintiffs appeal that decision, arguing that a "final judgment" cannot be rendered until the trial court resolves the merits of the City's counterclaim for a declaratory judgment that prior voter approval exists for the bonds proposed in City Question C. We disagree. The trial court properly concluded pursuant to Rule 54 that there was no just reason for delay in entering final judgment in favor of the City, because it had granted summary judgment in favor of the City on all of plaintiffs' claims. *See Lytle v. Kite,* 728 P.2d 305 (Colo.1986). It was not necessary for the trial court to address the City's counterclaim once it had disposed of plaintiffs' claims.

ballot title for County Question A reads in relevant part:

SHALL BOULDER COUNTY TAXES BE INCREASED $6.5 MILLION ANNUALLY (FIRST FULL FISCAL YEAR DOLLAR INCREASE) THROUGH A SALES AND USE TAX OF 0.25% (ONE QUARTER OF ONE PERCENT) BEGINNING JANUARY 1, 1994 AND ENDING DECEMBER 31, 2009, WITH PROCEEDS USED FOR TRAILS AND OPEN SPACE ACQUISITION AND MAINTENANCE AS MORE PARTICULARLY SET FORTH IN BOARD OF COUNTY COMMISSIONERS' RESOLUTION 93–174; AND SHALL BOULDER COUNTY DEBT BE INCREASED UP TO $40 MILLION WITH A REPAYMENT COST OF UP TO $50 MILLION PAYABLE SOLELY FROM A PORTION OF THE PROCEEDS OF SAID 0.25% SALES AND USE TAX, WHICH AUTHORIZATION SHALL INCLUDE AUTHORITY TO REFUND SUCH BONDS AND REFUNDING BONDS WITHOUT ADDITIONAL VOTER APPROVAL; AND SHALL BOULDER COUNTY BE AUTHORIZED TO RECEIVE AND SPEND THE FULL REVENUES GENERATED BY SAID 0.25% SALES AND USE TAX AND THE PROCEEDS OF SAID BONDS DURING 1994 AND EACH SUBSEQUENT YEAR WITHOUT LIMITATION OR CONDITION AND WITHOUT LIMITING IN ANY YEAR THE AMOUNT OF OTHER REVENUES THAT MAY BE COLLECTED AND SPENT BY BOULDER COUNTY? "SHALL A COUNTY–WIDE ONE QUARTER OF ONE PERCENT (0.25%) SALES AND USE TAX BE IMPOSED IN THE COUNTY OF BOULDER BEGINNING JANUARY 1, 1994 AND ENDING DECEMBER 31, 2009, EXEMPTING THEREFROM SALES AND PURCHASES OF CERTAIN ITEMS, INCLUDING, BUT NOT LIMITED TO, FOOD, FUEL, AND ENERGY FOR RESIDENTIAL LIGHT, HEAT AND POWER, AND MACHINERY AND MACHINE TOOLS, THE NET PROCEEDS OF WHICH SHALL BE EXPENDED FOR ACQUIRING, DEVELOPING NECESSARY ACCESS TO, AND PRESERVING OPEN SPACE REAL PROPERTY" ... AND WATER RIGHTS TO BE USED IN CONNECTION WITH OPEN SPACE LANDS ...; AND SHALL THE COUNTY OF BOULDER BE AUTHORIZED TO CREATE A SPECIAL FUND TO BE KNOWN AS THE "BOULDER COUNTY OPEN SPACE SALES AND USE TAX CAPITAL IMPROVEMENT FUND" (THE "FUND") AND TO ISSUE SALES AND USE TAX REVENUE BONDS (THE "BONDS") IN AN AGGREGATE AMOUNT OF $40 MILLION ... TO BE USED FOR CAPITAL IMPROVEMENTS INCLUDING ACQUISITION OF INTERESTS IN OPEN SPACE REAL PROPERTY ..., AND DEPOSIT A PORTION OF THE REVENUES OF THE SAID SALES AND USE TAX INTO THE FUND, PLEDGED TO THE REPAYMENT OF THE BONDS ..., WHICH AUTHORIZATION SHALL INCLUDE AUTHORITY TO REFUND SUCH BONDS AND REFUNDING BONDS WITHOUT ADDITIONAL VOTER APPROVAL; AND SHALL THE COUNTY OF BOULDER BE AUTHORIZED TO RECEIVE AND EXPEND THE FULL SALES AND USE TAX REVENUES AND THE PROCEEDS OF THE BONDS AND REFUNDING BONDS AUTHORIZED BY THE PASSAGE OF THIS MEASURE, AND TO BUDGET AND APPROPRIATE SUCH REVENUES, PROCEEDS AND EXPENDITURES APART FROM ANY OTHER EXPENDITURE OF THE COUNTY WHICH MAY BE LIMITED PURSUANT TO [AMENDMENT 1], AND THE REVENUES AND PROCEEDS AUTHORIZED FOR COLLECTION, RECEIPT AND EXPENDITURE BY THE PASSAGE OF THIS MEASURE SHALL NOT BE COUNTED IN ANY SUCH FISCAL YEAR SPENDING OR EXPENDITURE LIMITATION; ALL THE FOREGOING BEING IN ACCORDANCE WITH THE PROPOSAL SET FORTH IN RESOLUTION NO. 93–174 OF THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY

OF BOULDER DATED AUGUST 31, 1993.

Plaintiffs claim that County Question A violates Amendment 1 in that: (1) its ballot title constitutes an improper "consolidation" of ballot issues under subdivision 3(a) of Amendment 1; and that (2) the ballot title violates section 1–40–106(2), 1B C.R.S. (1993 Supp.), by presenting two separate questions to the voters and thus creating an ambiguity in the meaning of a "yes" or "no" vote on this proposal. The trial court rejected these claims for the reasons stated above in our discussion of School District Question 1 and City Question B. It specifically found that "under well-established Colorado law," the bonds involved in County Question A were "revenue bonds" and, as such, did not constitute "bonded debt" for purposes of Amendment 1's anti-consolidation clause.

## II

The first issue raised by plaintiffs on appeal pertains to the standard of review of claims brought to enforce the election provisions of Amendment 1. *See* Colo. Const. art. X, § 20(1) (stating that "[i]ndividual or class action enforcement suits may be filed" under that amendment). They contend, first, that the trial court erred in reviewing their Amendment 1 claims under a "substantial compliance" standard, *see Meyer v. Lamm*, 846 P.2d 862, 875–77 (Colo.1993), and should have reviewed such claims instead under "strict scrutiny" analysis. *See Evans v. Romer*, 854 P.2d 1270, 1275 (Colo.1993) ("Laws that are subject to strict scrutiny review will be sustained only if they are supported by a compelling state interest and narrowly drawn to achieve that interest in the least restrictive manner possible."). Plaintiffs also assert that the trial court erred in rejecting their claims on the basis that plaintiffs failed to plead that the alleged violations of Amendment 1 would have affected the election results.

**6.** Amendment 1 defines "district" as "the state or any local government, excluding enterprises."

## A

Plaintiffs' contention that "strict scrutiny" analysis applies to violations of Amendment 1 is based primarily on their view that Amendment 1 creates a new "fundamental right" to vote on any measure involving an increase in taxes or governmental debt. We disagree.

██ It is axiomatic that "the right to vote is a fundamental right of the first order." *Meyer*, 846 P.2d at 874; *Erickson v. Blair*, 670 P.2d 749, 754 (Colo.1983). Thus, citizens have the right to be free from restrictions that deny the franchise or render its exercise so difficult and inconvenient as to amount to the denial of the right to vote. *Moran v. Carlstrom*, 775 P.2d 1176, 1180 (Colo.1989). The question posed by plaintiffs in this case, however, is whether Amendment 1 is properly viewed as creating a new form of that right for purposes of substantive due process analysis. To decide this question, we must first examine the plain language of Amendment 1.

The title of Amendment 1 is the "Taxpayer's Bill of Rights." The provisions of the amendment are worded, however, not as creating "rights" vested in Colorado's taxpayers but as imposing limitations on the spending and taxing powers of state and local government. For example, the "preferred interpretation" of Amendment 1 is that which "reasonably restrain[s] most the growth of government." Colo. Const. art X, § 20(1). Similarly, Amendment 1's provisions governing ballot titles and election notices for tax and debt increases are worded in terms of what actions *districts*[6] "may" or "shall" undertake in presenting ballot issues to the electorate. *E.g., id.* §§ 20(3) ("districts shall mail at the least cost ... a titled notice or set of notices....") & —(4) ("Starting November 4, 1992, districts must have voter approval in advance...."). Finally, Amendment 1's provisions regulating state and local spending and revenue also are phrased in terms of the obligations imposed on state and local government and not in terms of vesting any new rights in the citizens of Colorado. *E.g., id.* §§ 20(7)(b) ("The maximum annual percent-

Colo. Const. art. X, § 20(2)(b).

age change in each local district's fiscal year spending equals inflation in the prior calendar year plus annual local growth....") & — (8)(b) ("Each district may enact cumulative uniform exemptions and credits to reduce or end business personal property taxes.").

The only provision cited by plaintiffs which refers to the exercise of the voter franchise is the requirement imposed on districts to seek "voter approval in advance" for any new tax or debt increases. *Id.* § 20(4)(a). That provision does not give rise, however, to a new substantive voting right as plaintiffs suggest. Since 1910 the citizens of Colorado have reserved to themselves "the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly." Colo. Const. art. V, § 1. Amendment 1 is a perfect example of the people exercising their initiative power to enact laws in the specific context of state and local government finance, spending and taxation. Thus, Amendment 1's requirement of electoral approval is not a *grant* of new powers or rights to the people, but is more properly viewed as a *limitation* on the power of the people's elected representatives.

This conclusion is consistent with the principle that the Colorado Constitution, unlike the federal constitution, does not comprise a grant of power to the legislative branch, but rather is a restriction on that power. All legislative power which is not limited by the Colorado Constitution is vested in the people. Colo. Const. art. II, § 1; *Reale v. Board of Real Estate Appraisers,* 880 P.2d 1205, 1207–08 (Colo.1994); *Colorado State Civil Serv. Employees Ass'n v. Love,* 167 Colo. 436, 447, 448 P.2d 624, 628 (1968). Accordingly, we find no support for plaintiffs' contention that Amendment 1 creates in the citizens of Colorado a new "fundamental right" to vote on debt and tax ballot issues.

Plaintiffs claim, alternatively, that strict scrutiny review applies in this case simply because the text of Amendment 1 contains highly detailed provisions. However, it cannot plausibly be argued that a constitutional provision triggers heightened scrutiny merely because its language is de-

tailed or otherwise specific. Under that analysis, claims under the highly detailed provisions in the Colorado Constitution governing, for example, games of chance and the state-supervised lottery would have to be reviewed under strict scrutiny. *See* Colo. Const. art. XVIII, § 2. We decline to adopt such an unprecedented approach to constitutional interpretation.

We also find unpersuasive plaintiffs' attempt to · analogize alleged violations of Amendment 1 to the taking of property by state and local governments without just compensation. Plaintiffs contend that governmental entities should be subjected to the same heightened scrutiny in Amendment 1 cases as they are when they exercise the power of eminent domain because, in both cases, "the government will be the pecuniary beneficiary of its own actions." However, it is well established that the "power to assess and collect taxes is separate and distinct from the power to take private property for a public use." *Burtkin Assocs. v. Tipton,* 845 P.2d 525, 529 (Colo.1993); *see also Houck v. Little River Drainage District,* 239 U.S. 254, 264, 36 S.Ct. 58, 61, 60 L.Ed. 266 (1915). Accordingly, violations of Amendment 1, the principal purpose of which is to regulate the manner and extent of state and local taxation and spending, do not implicate the policy favoring strict construction of eminent domain statutes. *See Town of Red Cliff v. Reider,* 851 P.2d 282, 284 (Colo.App.1993).

The real issue raised by plaintiffs is whether courts should require districts to meet a "strict compliance" or a "substantial compliance" standard in Amendment 1 enforcement cases. *See Meyer,* 846 P.2d at 875–78. Unless an election regulation expressly declares that strict compliance with its requirements is essential, courts should construe such provisions to be directory in nature and not mandatory. *See, e.g., Young v. Simpson,* 21 Colo. 460, 462, 42 P. 666, 667 (1895); *accord People ex rel. Johnson v. Earl,* 42 Colo. 238, 252, 94 P. 294, 298–99 (1908) (holding that "the will of the electors, when fully and freely expressed, will not be defeated by a strict and technical construction of the law"). Imposing a requirement of strict compliance with voting regulations, es-

pecially in the absence of any showing of fraud or other intentional wrongdoing, would unduly restrict the franchise. *See, e.g., Meyer,* 846 P.2d at 875–78 (construing write-in voting statute); *Erickson,* 670 P.2d at 754–55 (rejecting previous rule of strict compliance with absentee ballot regulations); *cf. Stegon v. Pueblo West Metro. District,* 198 Colo. 128, 130, 596 P.2d 1206, 1208 (1979) (applying rule of strict compliance to statutory notice requirement because "notice requirements for special elections should be construed more strictly than for general elections"). We have recognized that "[e]lections should not be lightly set aside" and that, as a matter of public policy, courts should not invalidate the results of a bond election unless "clear grounds" for such action is shown. *Felzien v. School District RE–3 Frenchman,* 152 Colo. 92, 96, 380 P.2d 572, 574 (1963); *Baldauf v. Gunson,* 90 Colo. 243, 245–46, 8 P.2d 265, 266 (1932); *see also Burbank v. Board of County Comm'rs,* 70 Colo. 302, 306–07, 201 P. 43, 44–45 (1921) (rules governing election procedure and format are not to be strictly construed due to the fact that mistakes are inevitable and that a strict approach would disfranchise voters unnecessarily).

 Accordingly, under the principles set forth above, we hold that a "substantial compliance" standard is the proper measure when reviewing claims brought to enforce Amendment 1's election provisions. In determining whether a district has substantially complied with a particular provision of Amendment 1, courts should consider factors including, but not limited to, the following: (1) the extent of the district's noncompliance with respect to the challenged ballot issue, that is, a court should distinguish between isolated examples of district oversight and what is more properly viewed as systematic disregard of Amendment 1 requirements, (2) the purpose of the provision violated and whether that purpose is substantially achieved despite the district's noncompliance, and (3) whether it can reasonably be inferred that the district made a good faith effort to comply or whether the district's noncompliance is more properly viewed as the product of an intent to mislead the electorate. *See, e.g., Meyer,* 846 P.2d at 876 (ballot substantially complies with election law if "the spirit

and intention of the law is not violated, although a literal construction would vitiate it"); *Kelly v. Novey,* 136 Colo. 408, 410, 318 P.2d 214, 215–16 (1957) (only if violation of election law prevented realization of the "true will and purpose of the voters" will election results be set aside); *see also Erickson,* 670 P.2d at 754 (absentee ballot fails even a "substantial compliance" standard where a showing of "fraud, undue influence, or intentional wrongdoing" is made).

### B

We now address plaintiffs' contention that the trial court erred in dismissing their claims on the ground that plaintiffs failed to allege facts showing that the election results would have been different had the claimed violations of Amendment 1 not occurred. We agree that no such pleading requirement applies to actions brought under Amendment 1's enforcement clause.

In *Abts v. Board of Educ. of School District RE–1,* 622 P.2d 518, 522 (Colo.1980), a case involving a challenge to the validity of a school bond election, we held that "[w]here the complaint does not allege facts showing that the irregularities complained of changed the result of the election, the complaint does not state a claim." *See also Jardon v. Meadowbrook–Fairview Metro. District,* 190 Colo. 528, 533, 549 P.2d 762, 765 (1976). In determining whether this common law pleading requirement applies to claims brought under Amendment 1, we begin with the text of that amendment.

 Amendment 1 states that "[i]ndividual or class action enforcement suits may be filed" under that amendment and that such suits have "the highest civil priority of resolution." Colo. Const. art. X, § 20(1). Amendment 1 then sets forth in detail the proper form and content of ballot titles and election notices for ballot initiatives involving district tax or debt increases. *See* Colo. Const. art. X, § 20(3) & 20(4). Although Amendment 1 does not expressly vitiate the pleading requirement established in the *Abts* line of cases, in our view any reasonable interpretation of Amendment 1's enforcement clause precludes our recognition of

such a requirement in the context of the cases now before us.

A requirement that a plaintiff allege facts showing that the election results would have been different had the claimed violations not occurred would make enforcement of Amendment 1's provisions effectively impossible in most elections. When we consider that legal voters may not be compelled to disclose their vote or the reasons behind their vote, *Mahaffey v. Barnhill*, 855 P.2d 847, 850 (Colo.1993), it is unclear how a plaintiff filing an enforcement suit under Amendment 1 could overcome a motion to dismiss on the pleadings except in the rarest of circumstances.[7] Thus, to extend the pleading requirement in *Abts* to suits brought under Amendment 1 would defeat that amendment's express intent to permit taxpayer enforcement of its provisions. We decline to do so.

Accordingly, we hold that a plaintiff suing under Amendment 1's enforcement clause need not set forth in his or her complaint facts showing that the claimed violations of Amendment 1 affected the election results.[8]

### III

■ We next address plaintiffs' claim that School District Question 1, City Question C and County Question A each violated Amendment 1, subdivision 3(a)'s prohibition against the "consolidation" of ballot issues involving "bonded debt." Plaintiffs interpret subdivision 3(a) to forbid districts from seeking approval, in a single ballot title,[9] of both

an increase in indebtedness and an increase in taxes with which to repay that debt. In their view, such a broad interpretation of the anti-consolidation provision would "reasonably restrain most the growth of government" by increasing voter control over government finance. For the reasons stated below, we conclude that the ballot titles in question do not violate subdivision 3(a) of Amendment 1.

Amendment 1 reads in pertinent part as follows:

(3) **Election provisions.** (a) Ballot issues shall be decided in a state general election, biennial local district election, or on the first Tuesday in November of odd-numbered years. *Except for petitions, bonded debt, or charter or constitutional provisions, districts may consolidate ballot issues* and voters may approve a delay of up to four years in voting on ballot issues.

Colo. Const. art. X, § 20(3)(a) (emphasis added). The terms "bonded debt" and "consolidate" are not defined in Amendment 1. In order to decide whether the ballot issues in this case violate subdivision 3(a), we must first determine whether a "consolidation" of "bonded debt" issues has occurred. In making this determination, we are guided by several principles of statutory construction.[10]

■ First, all provisions of Amendment 1 "supersede *conflicting* state constitutional, state statutory, charter, or other state or local provisions." *Id.* § 20(1) (emphasis added). A conflict exists when one provision

---

7. For example, if the numbers of voters for and against a measure are almost exactly equal, it is possible that a plaintiff could find enough voters who would testify that they would have voted differently had the alleged violations of Amendment 1 not occurred, thereby satisfying the *Abts* requirement. Outside of this limited context, however, the rule in *Abts* would seem to prevent any realistic possibility of success for plaintiffs suing under Amendment 1.

8. We do not address the separate issue of whether, and under what circumstances, the pleading requirement described in *Abts* applies to election challenges which are not governed by Amendment 1.

9. Subsequent to the filing of this action, the General Assembly created a new procedure, effective July 1, 1994, for challenging the ballot

order or ballot title of an initiative governed by Amendment 1. That statute provides that challenges to the ballot order or ballot title hereafter must be brought in the district court for summary adjudication within five days after the ballot order or ballot title has been set by the state or relevant political subdivision. § 1–11–203.5(2) 1B C.R.S. (1994 Supp.) It also states that its provisions "shall be the exclusive procedure to contest or otherwise challenge the order of the ballot or the form or content of the ballot title." § 1–11–203.5(5). No comparable procedure was in effect at the time the ballot titles at issue in this case were set.

10. Courts may rely upon the general rules of statutory construction when interpreting citizen-initiated measures. *See Center for Public Interest Law v. Fair Political Practices Comm.*, 210 Cal. App.3d 1476, 259 Cal.Rptr. 21, 26 (1989).

authorizes what the other forbids or forbids what the other authorizes. *In re Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d 1, 6 (Colo.1993). Where no such conflict exists, however, courts should presume a newly-enacted provision has been "framed and adopted 'in the light and understanding of prior and existing laws and with reference to them.'" *Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization,* 761 P.2d 197, 202 (Colo.1988) (quoting *Krutka v. Spinuzzi,* 153 Colo. 115, 124, 384 P.2d 928, 933 (1963)). Second, the "preferred interpretation [of Amendment 1] shall reasonably restrain most the growth of government." Colo. Const. art. X, § 20(1). Thus, where multiple interpretations of an Amendment 1 provision are equally supported by the text of that amendment, a court should choose that interpretation which it concludes would create the greatest restraint on the growth of government. Third, an unjust, absurd or unreasonable result should be avoided when construing a constitutional provision. *See People v. Johnson,* 797 P.2d 1296, 1298 (Colo.1990); *Ingram v. Cooper,* 698 P.2d 1314, 1315 (Colo. 1985). Finally, an interpretation which harmonizes different constitutional provisions is favored over one that would create a conflict between them. *Colorado Common Cause v. Bledsoe,* 810 P.2d 201, 207 (Colo.1991).

As we noted above, Amendment 1 is silent on the meaning of the term "consolidation," notwithstanding the fact that Amendment 1 does provide definitions for several of its key terms. *See* Colo. Const. art. X, § 20(2) ("Term definitions"). We therefore presume that this term was included in Amendment 1 in reference to the pre-existing law governing when two topics may or may not be united in one ballot title. *See* § 2–4–203(d), 1B C.R.S. (1980) (in construing ambiguous statutes, courts may consider the "common law or former statutory provisions, including laws upon the same or similar subjects").

 This court has long held that more than one topic may be submitted to the voters in a single ballot title if the topics are "so connected with or dependent upon the general subject that it might not be desirable that one be adopted without the other." *People ex rel. Elder v. Sours,* 31 Colo. 369,

405, 74 P. 167, 178 (1903); *see also Abts,* 622 P.2d at 523 (bond issue having more than one purpose is validly set forth in a single ballot issue where "there exists a natural relationship between the various structures or objects united in one proposition so that they form but one rounded whole"); *People ex rel. Moore v. Perkins,* 56 Colo. 17, 40–42, 137 P. 55, 62–63 (1913) (municipal charter amendment does not combine distinct and separate questions if its provisions are naturally related and connected with one subject). More specifically, Article XI, Section 6 of the Colorado Constitution indicates that the incurrence of debt and the levy of a tax with which to repay that debt are part and parcel of the same issue:

> **Section 6. Local Government Debt.** (1) No political subdivision of the state shall contract any general obligation debt … except by adoption of a legislative measure which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied *and providing for the levy of a tax which together with such other revenue, assets, or funds as may be pledged shall be sufficient to pay the interest and principal of such debt.*

Colo. Const. art. XI, § 6(1) (emphasis added). As plaintiffs correctly concede, Amendment 1 did not repeal Article XI, Section 6 either expressly or by necessary implication. Accordingly, School District Question 1, City Question C and County Question A do not violate subdivision 3(a) of Amendment 1 because those ballot issues present a single subject for voter approval. *See Cook v. City of Delta,* 100 Colo. 7, 17, 64 P.2d 1257, 1261 (1937) (initiated amendment to city charter upheld although amendment provided for both the municipal acquisition of light and power plant and the issuance of bonds to finance that acquisition, because "[t]he manner of payment is so closely related to the manner of acquisition as to necessitate its consideration as an incident to, or a means of, making the mandate to acquire effective"); *see also Routt v. Barrett,* 396 Ill. 322, 71 N.E.2d 660, 666 (1947) (ballot question proposing tax levy incident to debt increase

"embodied but one question"); *Neal v. Board of Supervisors*, 243 Iowa 723, 53 N.W.2d 147, 151 (1952) (ballot proposal to construct hospital and to levy necessary tax to pay for construction held "not dual in nature"); *State ex rel. Shelley v. Board of County Comm'rs*, 156 Neb. 583, 57 N.W.2d 129, 130 (1953) (proposition to issue bonds and to levy tax held "one indivisible proposition"); *Garcia v. Duval County*, 354 S.W.2d 237, 240 (Tex.Civ. App.1962) (holding that issuance of bonds and tax to repay bonds were "inextricably joined matters" which could not be submitted sensibly to voters as separate propositions).

■ Furthermore, even if we were to agree with plaintiffs that the ballot issues in question each involved a "consolidation" for purposes of subdivision 3(a) of Amendment 1, it cannot be said that the governmental entities impermissibly consolidated ballot issues involving "bonded debt." Rather, the consolidation, if any, in School District Question 1 and City Question C is of a "bonded debt" issue and a related *tax* issue.[11] In the case of County Question A, because the district sought approval of "revenue bonds" as those are defined in subdivision 29–2–112(1), 12A C.R.S. (1986),[12] that ballot issue did not involve "bonded debt" at all. *See* § 29–2–112(9) ("The revenue bonds shall not constitute an indebtedness of the county, city or incorporated town within the meaning of constitutional or statutory debt limitation or provision.").

Plaintiffs contend, however, that certain provisions of Amendment 1 *implicitly* support their view that seeking approval in the same ballot issue of a debt increase and a tax levy constitutes an impermissible "consolidation." For example, plaintiffs cite subdivision 3(b) of Amendment 1, which provides in relevant part:

Except for district voter-approved additions, [election] notices shall include only:

. . . .

(ii) For proposed *district tax or bonded debt increases*, the estimated or actual total of district fiscal year spending for the current year. . . .

(iii) For the first full fiscal year of each proposed *district tax increase*, district estimates of the maximum dollar amount. . . .

(iv) For proposed *district bonded debt*, its principal amount and maximum annual and total district repayment cost. . . .

*Id.* § 20(3)(b) (emphasis added). Plaintiffs also cite the following language in subdivision 3(c) of Amendment 1:

Ballot titles for tax or bonded debt increases shall begin, "SHALL (DISTRICT) *TAXES* BE INCREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY . . .?" *or* "SHALL (DISTRICT) *DEBT* BE INCREASED (principal amount), WITH A REPAYMENT COST OF (maximum total district cost), . . .?"

*Id.* § 20(3)(c) (emphasis added). According to plaintiffs, by setting forth the requirements for ballot issues involving district debt and those involving district tax increases in the disjunctive form, Amendment 1 impliedly prohibits districts from seeking both a debt increase and an increase in taxes with which to repay that debt in the same ballot issue. We disagree.

■ The fact that, under subdivision 3(b) of Amendment 1, districts must disclose different information in their election notices for proposed tax increases and for proposed debt increases only means that where districts link approval of the debt increase to approval of the tax increase, they must disclose in the election notice the required information as to *each* of those increases. The same reasoning applies to subdivision 3(c)'s

---

11. Plaintiffs claim that subdivision 3(a) prohibits the consolidation in one ballot title of a "bonded debt" question with any other question, regardless of the subject. The plain language of subdivision 3(a), however, does not support such a broad construction. Rather, the logical interpretation of the phrase "[e]xcept for petitions, bonded debt, or charter or constitutional provisions, districts may consolidate ballot issues" is that districts may not present to the voters in a single ballot issue more than one question involving a petition, bonded debt or a charter or constitutional provision.

12. Because Amendment 1 does not define the term "bonded debt," in determining whether a ballot issue involves a consolidation of "bonded debt" we rely on the pre-existing law on this subject. *Carrara Place*, 761 P.2d at 202.

requirement that ballot titles involving debt and tax increases begin with certain specific information. Where the ballot title involves both a proposed debt increase and a proposed tax increase with which to repay that debt, the ballot title must include the language set forth in subdivision 3(c) as to both the debt and the tax increases. Thus, if the district chooses to begin that ballot title with the question "SHALL DISTRICT DEBT BE INCREASED IN THE PRINCIPAL AMOUNT OF X, WITH A REPAYMENT COST OF Y . . . ?" it must also include in the ballot title the language "SHALL DISTRICT TAXES BY INCREASED BY Z DOLLARS ANNUALLY . . . ?"

▌ As a last resort, plaintiffs claim that their proposed interpretation, which would graft onto Amendment 1 an implied prohibition against linking approval of both a debt increase and a tax increase in the same ballot issue, should be adopted by this court because it would "reasonably restrain most the growth of government." *Id.* § 20(1). We are not persuaded. Plaintiffs have cited no evidence to support their claim that forcing districts to submit related debt and tax increases to the electorate in separate ballot issues would "restrain most the growth of government." The mere assertion by a party that its interpretation would "reasonably restrain most the growth of government" is not dispositive. Rather, the party seeking to invoke the "preferred interpretation" has the burden of establishing that its proposed construction of Amendment 1 would reasonably restrain the growth of government more than any other competing interpretation. To hold otherwise would create the absurd result that any individual who disagrees with the will of the majority of the electorate could undermine the results of an election governed by Amendment 1 without presenting any evidence that his or her interpretation is actually "preferred" by Amendment 1.[13]

We conclude that the incurrence of a debt and the adoption of taxes as the means with which to repay that debt are properly viewed as a single subject when presented together in one ballot issue. This result is supported by the fact that, as the trial court correctly noted, in most cases "it might not be desirable that [the debt question] be adopted without the [tax question]." *Sours,* 31 Colo at 405, 74 P. at 178. Accordingly, the ballot titles for School District Question 1, City Question C and County Question A do not improperly "consolidate" ballot issues for purposes of subdivision 3(a) of Amendment 1.

## IV

We next address plaintiffs' claim that County Question A violates section 1–40–106(2), 1B C.R.S. (1993 Supp.), by presenting two separate ballot questions to the voters and thus creating an ambiguity in the meaning of a "yes" or "no" vote on this proposal. We find no merit in this contention.

Section 1–40–106(2) states that for local ballot issues, the title board (consisting of the designated election official and the governing board of the relevant political subdivision) "shall by resolution fix a proper fair title for each proposed measure substantially as provided in [section 1–40–106(3)(b) ]." Section 1–40–106(3)(b) provides in relevant part:

> Ballot titles shall be brief, shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed.

Plaintiffs are correct to note that the ballot title for County Question A contains two

---

13. Even if we assume, *arguendo,* that plaintiffs' suggested interpretation of Amendment 1 would somehow restrain the growth of government, such a restraint could hardly be described as reasonable. *See* Colo. Const. art. X, § 20(1) ("[Amendment 1's] preferred interpretation shall *reasonably* restrain most the growth of govern-

ment."). As the trial court correctly noted, adopting plaintiffs' suggested interpretation would likely cause confusion among the voters as to the relationship between the various debt and tax proposals on the ballot, and, consequently, require districts in some instances to raise district debt without the revenue to repay that debt.

separate parts.[14] The first paragraph presents the ballot issue in a clear and concise manner and in the interrogative form as required by section 1–40–106(3)(b). The second paragraph of the ballot title, which is set out in quotation marks, also presents a question to the voters, but in a slightly lengthier form. Plaintiffs claim that this two-tiered structure creates an impermissible ambiguity in the meaning of a "yes" or "no" vote by asking the electorate to give a single answer to two different questions. We disagree.

■ Even a summary examination of the ballot title for County Question A reveals that the County did not violate section 1–40–106(3)(b). Both paragraphs of the ballot title for County Question A present the question as whether the County should impose a 0.25% sales and use tax, beginning January 1, 1994 and ending December 31, 2009, for the purpose of acquiring and developing open space real property,[15] and whether the County should issue $40 million in bonds payable solely from a portion of that 0.25% sales and use tax.[16] The only difference between the two paragraphs of the ballot title is that the second paragraph is a more detailed version of the same question. For example, paragraph two mentions several exemptions from the sales and use tax (for food, fuel, certain types of energy and machinery) which are not mentioned in paragraph one. Paragraph two also refers to the creation of a special "Boulder County Open Space Sales and Use Tax Capital Improvement Fund" into which a portion of the revenues from the sales and use tax would be deposited and pledged for repayment of the bonds.

■ The fact that the paragraphs are not identical does not make the ballot title ambiguous for purposes of section 1–40–106(3)(b). Rather, the relevant determination is whether the two paragraphs are sufficiently different that a voter reasonably could vote in favor of the question as presented in one paragraph and yet decide to vote against the question as presented in the other paragraph. We agree with plaintiffs that the two-tiered format employed by the County should be avoided in general because of the risk that voters might be confused as to the question presented. In this case, however, it is implausible to suggest that a voter reasonably could have considered voting in favor of one paragraph in the ballot title and against the other paragraph, where the only difference between the two paragraphs is that one paragraph is slightly more detailed than the other.

In summary, although the ballot title could have been drafted in a more concise manner,[17] it accurately states the intent of the proposed measure and is not, on the whole, misleading or confusing as to the meaning of a "yes" or "no" vote. *See In re Amendment to Article XVI, Section 6, Colo. Const., Entitled "W.A.T.E.R.",* 875 P.2d 861, 864 (Colo. 1994), ("Our role is not to consider whether the Board set the best possible title, submission clause, and summary."); *In re Election Reform Amendment,* 852 P.2d 28, 32 (Colo. 1993) (courts should not interfere with title board's choice of language unless such language is "clearly misleading"). Accordingly, we reject plaintiffs' claim in this regard.

## V

Plaintiffs next claim that School District Question 1 and City Question C improperly

**14.** For the full text of the ballot title for County Question A, *see supra* at page 224.

**15.** The first paragraph of County Question A states that the proceeds of the bonds will be used for "trails and open space acquisition and maintenance as more particularly set forth in Board of County Commissioners' Resolution 93–74." Paragraph two also states more specifically that the proceeds of the bonds authorized by that measure will be used for "acquiring, developing necessary access to, and preserving open space real property or interests in open space real property and water rights to be used in connection with open space lands, and developing paths

and recreational trails, and for the maintenance, improvement, management and patrol of such open space real property."

**16.** Both parts of the ballot title also state that authorization of the bonds includes authorization to refund those bonds in the future without additional voter approval and authorization to receive and spend the revenues generated by the sales and use tax and the proceeds of the bonds without limitation or condition.

**17.** For example, the County could have used either paragraph of the ballot title alone to satisfy the requirements of section 1–40–106(3)(b).

seek a permanent exemption from Amendment 1's requirement that districts obtain voter approval in advance for any mill levy increases or bond refundings at higher interest rates. We disagree.

Plaintiffs cite as the basis of their claim the following language in the ballot titles for the two measures:

### School District Question 1

SHALL BOULDER VALLEY SCHOOL DISTRICT RE2'S DEBT BE INCREASED $89,000,000 WITH A REPAYMENT COST OF $166,290,620 ...; AND IN CONNECTION THEREWITH (I) SHALL THE DISTRICT'S AD VALOREM PROPERTY TAXES BE INCREASED IN ANY YEAR IN AN AMOUNT SUFFICIENT TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS WHEN DUE, *WITHOUT LIMITATION AS TO RATE* OR AMOUNT OR ANY OTHER CONDITION EXCEPT AS STATED ABOVE.... (emphasis added)

### City Question C

SHALL CITY OF BOULDER DEBT BE INCREASED UP TO $50,000,000 WITH A REPAYMENT COST OF UP TO $150,000,000 ... BY THE ISSUANCE AND PAYMENT OF BONDS OF THE CITY ... SUCH BONDS TO BE PAYABLE FROM SALES AND USE TAX REVENUES EARMARKED AND COMMITTED FOR SUCH PURPOSES BY VOTE OF THE CITY'S ELECTORS AND BY A PLEDGE OF THE FULL FAITH AND CREDIT OF THE CITY AS AUTHORIZED IN THE CITY'S CHARTER, *WHICH AUTHORIZATION SHALL INCLUDE AUTHORIZATION TO REFUND SUCH BONDS AND REFUNDING BONDS WITHOUT ADDITIONAL VOTER APPROVAL;* AND IN CONNECTION THEREWITH (I) SHALL CITY OF BOULDER AD VALOREM TAXES BE INCREASED IN ANY YEAR IN AN AMOUNT SUFFICIENT TO PAY THE PRINCIPAL OF AND INTEREST ON SUCH BONDS AND REFUNDING BONDS WHEN DUE, *WITHOUT LIMITATION AS TO RATE* OR AMOUNT OR ANY OTHER CONDITION EXCEPT AS STATED ABOVE.... (emphasis added)

According to plaintiffs, the phrase "without limitation as to rate" violates subdivision 4(a) of Amendment 1, which states that districts must have voter approval in advance for "any new tax, *tax rate increase* [or] mill levy above that for the prior year...." Colo. Const. art. X, § 20(4)(a) (emphasis added). Plaintiffs also argue that the phrase "which authorization shall include authorization to refund such bonds and refunding bonds without additional voter approval" [18] violates subdivision 4(b) of Amendment 1, which states that "[e]xcept for refinancing district bonded debt at a lower interest rate or adding new employees to existing district pension plans," voter approval in advance is required for the creation of "any multiple-fiscal year direct or indirect district debt or other financial obligation...." *Id.* art. X, § 20(4)(b) (emphasis added). We reject both of these arguments.

Plaintiffs contend initially that by seeking approval to raise ad valorem property taxes "without limitation as to rate" in order to repay the bonds, the City and the School District impermissibly attempted to "opt out" of the prior voter approval requirement for tax increases found in subdivision 4(a) of Amendment 1. However, in approving School District Question 1 and City Question C, the electorate authorized the governmental entities to adjust the tax rates as necessary to repay the specific debt incurred pursuant to those measures.[19] As the trial court correctly observed, Amendment 1 does not specifically prohibit this type of authorization, that is, "voter approval at a given election of mill levy increases in years beyond

---

**18.** Although this phrase is found in both City Question C and County Question A, plaintiffs only challenge its inclusion in City Question C.

**19.** As we discuss *infra* in part VII of this opinion, however, an important distinction between City

Question C and School District Question 1 is that, unlike the School District, the City failed to provide any estimate of the "first, or if phased in, final, full fiscal year increase" in taxes which would occur if City Question C were adopted.

the year immediately following the election." In fact, Amendment 1 seems to provide for precisely this scenario when it states that ballot titles for tax increases must include an estimate of the "first, *or if phased in,* final, full fiscal year dollar increase" in district taxes. *Id.* § 20(3)(c). Plaintiffs' interpretation, which would force districts to seek voter approval prior to each individual increase in the tax rate even if that rate change is merely a response to changes in the assessed valuation of property within the district, effectively eliminates any possibility of such a "phased in" tax increase.

By contrast, a more reasonable interpretation of subdivision 4(a)'s requirement of "voter approval in advance," and one which gives full effect to the language of the amendment, is that districts may seek present authorization for future tax rate increases where such rate increases may be necessary to repay a specific, voter-approved debt. *See Charlton v. Kimata,* 815 P.2d 946, 949 (Colo.1991) (supreme court must give effect, if possible, to every word of a statute). Of course, any rate change ultimately implemented by a district pursuant to this "without limitation as to rate" clause must be consistent with the district's stated estimate of the final fiscal year dollar amount of the tax increase. *See* Colo. Const. art. X, § 20(3)(c).

We also reject plaintiffs' claim that the language in City Question C authorizing the City to refund the bonds approved by that measure "without additional voter approval" violates subdivision 4(b) of Amendment 1. Once again, the question here is whether the electorate's approval of City Question C constitutes "voter approval in advance" of any future refunding of the bonds issued pursuant to that initiative. For the reasons mentioned above, we conclude that it does. Nothing in the language of Amendment 1 suggests that the voters' decision in City Question C, i.e., that the City should be allowed to refund its bonds without seeking additional voter approval, is invalid. Indeed, subdivision 4(b) expressly permits refunding of bonds without prior voter ap-

proval when such refinancing occurs at a lower interest rate. Plaintiffs ask us to speculate about the possibility that someday in the future the City will attempt to refund the bonds approved in City Question C at a *higher* interest rate and without prior voter approval. However, "[t]his court is not empowered to give advisory opinions based on hypothetical fact situations." *Tippett v. Johnson,* 742 P.2d 314, 315 (Colo.1987). If at some point the City decides to refund the bonds in the manner suggested by plaintiffs, they can seek appropriate relief at that time.

Accordingly, we conclude that the ballot titles for School District Question 1 and City Question C do not violate section 4 of Amendment 1.

## VI

We now address plaintiffs' argument that the ballot title for City Question B violates subdivision 3(c) of Amendment 1 by failing to begin with the words "SHALL CITY OF BOULDER TAXES BE INCREASED BY UP TO EIGHT MILLION DOLLARS ...?" We find no violation of Amendment 1 in this regard.

Subdivision 3(c) of Amendment 1 states that "[b]allot titles *for tax or bonded debt increases* shall begin, 'SHALL (DISTRICT) TAXES BE INCREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY ...?'" Colo. Const. art. X, § 20(3)(c) (emphasis added). Thus, the initial question before us is whether the ballot title for City Question B is properly viewed as a "ballot title for tax or bonded debt increases." We answer that question in the negative.

The primary purpose and effect of City Question B is to grant a franchise to Public Service to furnish gas and electricity to the City and its residents. Although the ballot title also seeks authorization for a contingent tax increase of up to $8 million annually, such an increase would only be implemented if a highly unlikely event were to occur, that is, that the City were somehow unable to collect from Public Service.[20] In

---

20. Plaintiffs concede in their brief to this court that "[a]n example of proper consolidation is

our view, City Question B is thus more properly viewed as a ballot issue for the granting of a franchise, rather than one "for tax or bonded debt increases" for purposes of subdivision 3(c). Therefore, the City was not required to begin the ballot title for that measure with the language "SHALL CITY TAXES BE INCREASED BY UP TO 8 MILLION DOLLARS ...?"

## VII

Plaintiffs also claim that the ballot title for City Question C violates subdivision 3(c) of Amendment 1 by failing to include an estimate of the "first, or if phased in, final, full fiscal year dollar increase" in the City's ad valorem property taxes which would occur if that measure were approved. We agree.

Subdivision 3(c) of Amendment 1 provides, *inter alia,* that

> [b]allot titles for tax or bonded debt increases shall begin, "SHALL (DISTRICT) TAXES BE INCREASED (*first, or if phased in, final, full fiscal year dollar increase*) ANNUALLY ...?" or "SHALL (DISTRICT) DEBT BE INCREASED (principal amount), WITH A REPAYMENT COST OF (maximum total district cost), ...?" (emphasis added)

The ballot title for City Question C[21] states in relevant part:

> SHALL CITY OF BOULDER DEBT BE INCREASED UP TO $50,000,000 WITH A REPAYMENT COST OF UP TO $150,-000,000 (SUCH AMOUNT BEING THE TOTAL PRINCIPAL AND INTEREST THAT COULD BE PAYABLE OVER THE MAXIMUM LIFE OF SAID DEBT) BY THE ISSUANCE AND PAYMENT OF BONDS OF THE CITY FOR THE PURPOSE OF CONTINUING THE ACQUISITION OF OPEN SPACE REAL PROPERTY ... AS PREVIOUSLY AUTHORIZED BY A VOTE OF THE PEO-PLE IN 1971, IN A PRINCIPAL AMOUNT NOT TO EXCEED $50,000,000 ... SUCH BONDS TO BE PAYABLE FROM SALES AND USE TAX REVENUES EARMARKED AND COMMITTED FOR SUCH PURPOSES BY VOTE OF THE CITY'S ELECTORS ...; AND IN CONNECTION THEREWITH (I) SHALL CITY OF BOULDER AD VALOREM PROPERTY TAXES BE INCREASED IN ANY YEAR IN AN AMOUNT SUFFICIENT TO PAY THE PRINCIPAL OF AND INTEREST ON SUCH BONDS AND REFUNDING BONDS WHEN DUE ...?

City Question C thus proposes an increase in City debt of $50 million to be repaid from sales and use taxes specifically earmarked and committed for open space acquisition;[22] but, if those sales and use tax revenues are insufficient to repay the entire debt, City Question C also proposes an increase in the City's ad valorem property taxes "in an amount sufficient" to cover the principal and interest on those bonds. Plaintiffs contend that because the City was seeking approval of an ad valorem property tax increase, the City violated subdivision 3(c) of Amendment 1 by failing to include in the ballot title for City Question C an estimate of the "full fiscal year dollar increase" in such taxes.

As we noted above, districts may seek approval of both a debt increase, and a tax increase with which to repay that debt, in the same ballot issue. *See* discussion *supra* at pages 229–230. In such circumstances, of course, the ballot title must include the information required by subdivision 3(c) of Amendment 1 as to both the proposed debt and the proposed tax increases. *Id.* In this case, however, rather than including in City Question C an estimate of the proposed "full fiscal year dollar increase" in ad valorem property taxes, as required under subdivision

---

City Ballot Question B ... which combined a question of a utility franchise with a question of a contingent tax increase."

21. Unlike City Question B, the ballot title for City Question C is properly viewed as one "for tax or bonded debt increases" and, therefore, must comply with Amendment 1, subdivision 3(c)'s introductory language requirement.

22. City Question C does not propose an *increase* in sales and use taxes, but rather merely seeks authorization from the electorate, in accordance with Section 97 of the Boulder City Charter, to utilize a portion of the revenues generated by the existing sales and use tax for open space acquisition.

3(c), the City sought approval of a tax increase "in an amount sufficient to pay the principal of and interest on" the open space bonds.

The City claims initially that it was not required to provide a dollar estimate of the proposed ad valorem tax increase because City Question C would not actually cause a *net* increase in taxes. This argument is based on the fact that the proposed increase in ad valorem property taxes is contingent and would only occur if the sales and use tax revenues earmarked for repayment of the open space bonds were insufficient to repay the entire debt. Thus, according to the City, the increase in property taxes would only be offsetting an equal or greater reduction in sales and use taxes. We are not persuaded. The City's argument confuses a possible decrease in tax *revenues* with a reduction in the tax *rate*. The fact that a reduction in sales and use tax revenues may occur in the future due to a downturn in the local economy does not decrease the tax burden on the City's residents. Should sales and use tax revenues fail to cover the entire repayment cost of the open space bonds authorized by City Question C, the proposed increase in the ad valorem property tax "in an amount sufficient" to cover that deficit clearly would constitute a "tax increase" for purposes of subdivision 3(c).

■　　The City claims alternatively that it should be exempted from the requirement of calculating a dollar estimate of the increase in ad valorem property taxes in City Question C because "it is impossible to guess what that number would be." We recognize that where the amount of the tax increase is dependent upon a contingent event, such as a possible shortfall in revenues generated by a separate tax, calculating the dollar amount of that increase is a complex task. However, all that is required by Amendment 1 is a good faith estimate of the dollar increase,

something the City was able to provide in the ballot title for City Question B, notwithstanding the existence of a highly contingent triggering event. To create an exemption from the requirements of subdivision 3(c) any time a district has difficulties estimating its proposed tax increases would undermine the primary purpose of Amendment 1's disclosure provisions: that is, to provide the electorate with the information necessary to make an intelligent decision on ballot issues involving debt and/or tax increases. *See* Legislative Council of the Colorado General Assembly, *An Analysis of 1992 Ballot Proposals* 10 (1992) ("Election notice and information requirements will provide voters with an understanding of the need for new revenue and will result in a more informed electorate."). Accordingly, we reject the City's claim in this regard.

■　　We must now decide whether, absent a dollar estimate of the proposed ad valorem property tax increase, the ballot title for City Question C substantially complies with Amendment 1. Looking to the factors discussed above at page 227 as relevant to substantial compliance, the second factor is dispositive because Amendment 1 directly and clearly addresses this issue. By using the phrase "in an amount sufficient to pay the principal of and interest on such bonds," the City sought approval of an open-ended tax increase.[23] The problem with this approach is that Amendment 1 specifically includes the dollar estimate of a tax increase in the category of information which must not only be disclosed to the voters, but also must be disclosed in a specific format, generally at the beginning of the ballot title.[24] As we stated above, the purpose of such a disclosure requirement is to permit the voters to make informed choices at the ballot. In our view, that purpose was not substantially achieved in the case of City Question C's proposed ad valorem property tax increase

23. We note that School District Question 1 also proposes to raise ad valorem property taxes "in an amount sufficient" to repay the bonds in question. However, in contrast to City Question C, the School District provided a specific dollar estimate of the full fiscal year dollar increase in taxes which would likely occur upon passage of that measure ($10,862,540).

24. For ballot issues involving both a proposed debt increase and a tax increase for repayment of that debt, however, the district may choose to place the information concerning the debt increase at the beginning of the ballot title as long as the ballot title also includes the required information concerning the proposed tax increase. *See* discussion *supra* at pages 230–231.

because the ballot title failed to give any indication of the potential magnitude of that tax increase. Although it is certainly possible that the City will be able to repay the bonds entirely from sales and use tax·revenues, it is also possible that such proceeds will not be sufficient to cover the City's debt service requirements and that ad valorem property taxes would have to be raised in a significant amount. Without some estimate as to the upper limits of this possible tax increase, the ballot title for City Question C is constitutionally deficient.

Having determined that City Question C, as written, does not substantially comply with Amendment 1, we must decide the appropriate remedy.[25] Plaintiffs advance the following reasons why we should invalidate City Question C in its entirety: (1) this violation of Amendment 1 easily could have been avoided; (2) the City should have known that its Question C violated Amendment 1 because the City is "represented by competent counsel"; (3) the City violated "the public trust" by ignoring the requirements of "the most important law of the State"; and (4) if the measure is not struck down, the City would be permitted to reap considerable "pecuniary benefits" from its transgression. We disagree with plaintiffs' characterization of the City's conduct.

 There is no evidence in the record to suggest that the City intentionally or willfully violated subdivision 3(c) of Amendment 1. The City's stated reasons for failing to provide an estimate of the dollar amount of the tax increase indicate that its interpretation of City Question C (as not involving a "tax increase" at all) was based on a good faith, albeit erroneous, construction of the relevant provisions. Furthermore, " '[a]s a general rule if a statute is constitutional in one part and unconstitutional in another, the constitutional provision may be sustained and the unconstitutional stricken.' " *Riverton Produce Co. v. State of Colorado,* 871 P.2d 1213, 1226 (Colo.1994) (citing *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70

(Colo.1981)). The only portion of City Question C which should be invalidated is its authorization for the City to increase ad valorem property taxes "in an amount sufficient to pay the principal of and interest on" the open space bonds. By contrast, the first portion of that measure, which authorizes the City to issue bonds in a principal amount not to exceed $50,000,000 (with a repayment cost of up to $150,000,000), "payable from sales and use tax revenues earmarked and committed for such purposes by vote of the City's electors and by a pledge of the full faith and credit of the City as is authorized in the Charter ..." does not violate Amendment 1. Plaintiffs have made no argument that this provision authorizing the issuance of sales and use tax revenue bonds is "inextricably intertwined" with the invalid ad valorem property tax increase. *See id.* Therefore, it need not be stricken from City Question C.

In summary, the language in City Question C referring to a proposed increase in ad valorem property taxes "in any year in an amount sufficient to pay the principal of and interest on such bonds and refunding bonds when due" is ineffective and must be severed from that remainder of that measure. All other provisions in City Question C, however, are valid and enforceable as adopted by the electorate.

### VIII

Plaintiffs next assert that the election notices for City Questions B and C and School District Question 1 failed in several respects to comply with subdivision 3(b) of Amendment 1. We will examine the claims made against each of the election notices separately.

#### City Question B

The first claim made by plaintiffs against the election notice for City Question B is that the City "fiddled with its books so that its election notice ... would seem to show a reduction in spending." More specifically, plaintiffs contend that in calculating its "fis-

**25.** Our ruling here is confined to the effect of Amendment 1. We do not address the City's contention, raised in its counterclaim, that prior voter approval in 1971 made it unnecessary for the City to again seek voter approval after the adoption of Amendment 1. The trial court did not address the city's counterclaim and it is not before us.

cal year spending" for the year 1992, the City improperly included a "reserve transfer" of $33 million. The alleged effect of this "fiddling" was to inflate artificially the City's 1992 budget, thereby "making the subsequent fiscal year spending seem to shrink, and making the requested tax increase seem more reasonable." Thus, according to plaintiffs, because the City's inaccurate calculation of "fiscal year spending" made the election notice for City Question B misleading, districts should be permanently enjoined from employing that accounting method in future election notices.

Subdivision 3(b) of Amendment 1 states in relevant part:

> (b) 15–25 days before a ballot issue election, districts shall mail . . . a titled notice or set of notices addressed to "All Registered Voters" at each address of one or more active registered electors.... Except for district voter-approved additions, notices shall include only:
>
> . . . .
>
> (ii) For proposed district tax or bonded debt increases, *the estimated or actual total of district fiscal year spending for the current year and each of the past four years*, and the overall percentage and dollar change.

Colo. Const. art. X, § 20(3)(b)(ii) (emphasis added). The term "fiscal year spending" is defined in Amendment 1 as

> all district expenditures and *reserve increases* except, as to both, those for refunds made in the current or next fiscal year or those from gifts, . . . *reserve transfers or expenditures*, damage awards, or property sales.

*Id.* § 2(e) (emphasis added).

■ The plain language of Amendment 1 does not prohibit the calculation method employed by the City. The terms "reserve transfers or expenditures" and "reserve increases" are not defined in Amendment 1 and thus it is entirely unclear whether the City's $33 million "cash reserves" are properly viewed as a "reserve increase," a "reserve transfer" or a "reserve expenditure" for pur-

poses of subdivision 2(e). We need not decide this issue, however, because the City clearly disclosed in its election notice, just below its fiscal year spending data, that fiscal year spending for 1992 "included the accrual of $33,947,000 in cash reserves associated with the passage of Amendment One." Therefore, plaintiffs' claim that the City's calculation of its fiscal year spending data may have misled the voters is without foundation. The data chart included in the City's election notice plainly shows that the only reason the City's fiscal year spending decreased between 1992 and 1993 is because it included those one-time "cash reserves" in its figure for 1992.

■ Plaintiffs also claim that the election notice for City Question B failed to comply with Amendment 1 subdivision 3(b)(ii)'s requirement that the City disclose the "overall percentage and dollar change" in its fiscal year spending over the relevant five year disclosure period (1989–1993). Although the election notice contains a chart labelled "Estimated total of district fiscal year spending for the current year and each of the past four years, *and the overall percentage and dollar change*," plaintiffs correctly note that the chart lacks any figures representing the *overall* percentage change in fiscal year spending over the five year period. However, the City's omission in this regard is not significant, because all of the information relevant to calculating the overall percentage change was provided by the City in its chart. Moreover, there is no evidence in the record to suggest that this isolated error was the product of anything other than a mere oversight by the City in preparing its election notice. Thus, on the whole, we conclude that the election notice for City Question B substantially complies with the disclosure requirements set forth in subdivision 3(b) of Amendment 1.

### City Question C

Plaintiffs allege that the election notice prepared for City Question C contains four separate violations of Amendment 1.[26] Their

---

26. To the extent these claims involve only that portion of City Question C which we have previously invalidated (i.e., the ad valorem property tax increase), we need not address them. For

first claim is the same claim made against the election notice for City Question B, that is, that the City "fiddled with its books" and failed to provide data regarding the "overall percentage change" in fiscal year spending as required in subdivision 3(b)(ii) of Amendment 1. We reject this claim for the reasons provided above in our analysis of the election notice for City Question B.

The second issue raised by plaintiffs is that the election notice for City Question C failed to provide the "text" of the ballot issue as required by subdivision 3(b)(i) of Amendment 1. That section provides that "[t]he election date, hours, ballot title, *text,* and local election office address and telephone number" must be included in the election notice. Colo. Const. art. X, § 20(3)(b)(i) (emphasis added). Plaintiffs claim that in the case of City Question C, the term "text" should be construed to refer to the text of City Ordinance No. 5584.[27] We disagree.

■ The word "text" is not defined in Amendment 1, so it is unclear what is encompassed within the requirement to publish the "text" of a ballot issue in the election notice. Therefore, we must look to existing law for guidance on this question. *See Carrara Place,* 761 P.2d at 202. For example, the "ballot title" of an initiative is defined as a "brief statement that fairly and accurately represents the true intent and meaning of the proposed *text* of the initiative" and which must be written in the form of "a question which may be answered by 'yes' or 'no.' " § 1–40–102(2) & –102(8) & –102(10) (emphasis added). In a separate provision, the "draft" of an initiative is defined as "the typewritten proposed *text* of the initiative which, if passed, becomes the actual language of the constitution, statute, charter provision, or ordinance...." § 1–40–102(4), 1B C.R.S. (1993 Supp.) (emphasis added). Thus, the ballot title of an initiative and its "text" may

in some instances contain different information, for example, where the ballot title is a condensed version of a lengthy proposed constitutional or charter amendment. *See* Colo. Const. art. XIX, § 2; § 31–2–210(4), 12B C.R.S. (1986). Amendment 1 recognizes this possibility by listing the "ballot title" and the "text" as separate items in subdivision 3(b)(i). However, where the ballot issue contains the entire substance of the question presented to the voters, and thus is not a summary of some lengthier "text" or "draft" of the initiative, we conclude that the district need only include the ballot title in the election notice. To hold otherwise would force districts to include in their election notices information which is unnecessarily duplicative and potentially confusing.

■ In this case, plaintiffs contend that the ballot title and election notice for City Question C did not contain the entire substance of that measure. They claim that the following language in Ordinance No. 5584 was omitted from the ballot title and election notice: "under Section 97 of the [City] charter ... the city is presently authorized to issue up to an additional *$30,976,000* of [open space] bonds ... without an election and may in the future be authorized to issue additional bonds thereunder...." (Emphasis added.) We are not persuaded. Although it is true that the ballot title for City Question C seeks voter approval to issue up to *$50,000,000* in open space bonds, the ballot title also makes clear that the principal amount of such bonds is "not to exceed $50,-000,000 *or such lesser amount as is permitted from time to time by Section 97 of the City's Charter relating to open space bonds....*" Thus, the ballot title accurately conveys the fact that the principal amount of the bonds is subject to the limits imposed by Section 97 of the City's Charter.

example, in light of our holding *supra* that City Question C's proposed increase in ad valorem property taxes is invalid because the *ballot title* for that measure failed to include an estimate of the full fiscal year dollar increase in taxes, we need not address plaintiffs' related claim that such an omission from the *election notice* also constitutes a violation of subdivision 3(b)(iii) of Amendment 1.

**27.** As we noted above, Ordinance No. 5584 authorized the City to seek voter approval in the November 1993 election for the issuance of up to $50,000,000 in bonds for the purpose of acquiring open space real property. *See supra* note 4.

■ Finally, plaintiffs claim, and the City concedes, that where a discrepancy exists between the total debt repayment cost as stated in the election notice and the amount of that repayment cost as stated in the ballot title, the district should be bound by the lower figure. For example, the City stated in its election notice that the total debt repayment cost for the $50 million bonds authorized by City Question C would be $115,-803,000. However, the City changed that figure in its ballot title for City Question C, stating that the total debt repayment cost would be "up to $150,000,000." We agree with the parties that the City should be held to the lower of the two figures because the electorate did not receive any advance notice of the higher debt repayment cost.

In summary, we conclude that as to the valid portions of City Question C, the election notice published by the City substantially complies with the requirements set forth in Amendment 1. However, the total debt repayment cost of the bonds approved in City Question C may not exceed $115,803,000 under that measure.

### School District Question 1

Plaintiffs challenge the election notice for School District Question 1 on only one ground: that the School District failed to provide the "text" of that ballot issue as required by subdivision 3(b)(i) of Amendment 1. We find no merit in plaintiffs' contention.

Plaintiffs assert that the "text" of School District Question 1 is the transcript of the Board of Education of Boulder Valley School District RE–2's September 2, 1993, resolution authorizing the School District to submit that question to the electorate. According to plaintiffs, this submission resolution contains certain information which is not in the ballot title for School District Question 1 and which the School District should have included in its election notice.[28] We disagree.

**28.** In claiming that School District Question 1 "involved much more than what was stated in the ballot title," plaintiffs cite the following details found in the submission resolution: (1) School District Question 1 is part of a larger seven-year plan formulated by the Board of Education "to deal with the present and future capi-

■ The absence of the submission resolution from the election notice for School District Question 1 did not make the election notice insufficient or misleading in any way. Amendment 1 does not require districts to include in their election notices the ministerial acts, orders or directions of the governing body authorizing submission of a particular initiative to the electorate where to do so would be duplicative and potentially confusing and would not add any substantive information to the election notice which was not already disclosed in the ballot title. Because the ballot title for School District Question 1 contains the entire substance of the ballot issue presented to the voters, it cannot be said that the School District violated Amendment 1 by failing to include a transcript of the submission resolution in its election notice.

Accordingly, we reject plaintiffs' challenge to the election notice for School District Question 1.

### IX

In summary, we affirm the trial court's rulings dismissing plaintiffs' claims against the School District and the County. We also affirm the trial court's entry of summary judgment in favor of the City as to plaintiffs claims against City Question B. However, we conclude that, in part, the ballot title for City Question C does not substantially comply with the requirements set forth in subdivision 3(c) of Amendment 1. That portion of City Question C which proposes to raise ad valorem property taxes in an unspecified amount is invalid and must be severed from the remainder of that measure. Accordingly, we remand the case to the trial court for further proceedings consistent with this opinion.

tal needs of the District;" (2) approval of School District Question 1 will not expire by reason of a time lapse in implementing its provisions; and (3) the Board of Education intended the provisions of this submission resolution to be severable should any one of them be adjudged to be unenforceable.