**CITY OF COLORADO SPRINGS, a home rule city and Colorado municipal corporation, Plaintiff–Appellant,**

v.

**W. Kenneth BULL, John W. Heimsoth, June Heimsoth, Douglas Bruce, and Douglas N. Stinehagen, individually and as representatives of a class of persons signing certain petitions for initiated ordinances relating to city deficit spending and city revenue changes, Defendants–Appellees.**

**No. 06CA0538.**

Colorado Court of Appeals, Div. A.

Aug. 10, 2006.

Patricia K. Kelly, City Attorney, Shane White, Assistant City Attorney, Colorado Springs, Colorado, for Plaintiff–Appellant.

W. Kenneth Bull, Pro Se.

John W. Heimsoth, Pro Se.

June Heimsoth, Pro Se.

Douglas Bruce, Pro Se.

Douglas N. Stinehagen, Pro Se.

Opinion by Judge ROY.

The City of Colorado Springs (the City) appeals the trial court's order denying its summary judgment motion and entering summary judgment to the defendants, W. Kenneth Bull, John W. Heimsoth, June Heimsoth, Douglas Bruce, and Douglas N. Stinehagen, and denying its motion for summary judgment. We affirm in part, reverse in part, and remand with directions.

This matter came before the motions division of this court on July 13, 2006, on the City's motion for a stay of execution pending appeal and on the defendants' motion to dismiss for lack of jurisdiction. Because the issues relate to an initiative which the trial court ordered placed on the ballot for the general election scheduled for November 7, 2006, the division (1) denied the City's request for a stay of execution; (2) made a preliminary determination on the jurisdictional issues and granted leave to the parties to address further the issue in their briefs on the merits; and (3) expedited the appeal.

The facts here are not in dispute. On January 18, 2005, the defendants filed petitions for two initiated ordinances with the City Clerk's Office. On January 28, 2005, the titles for the proposed initiatives were designated and fixed. On February 10, 2005, the City Clerk's Office issued for circulation petitions for signatures for both initiatives. As provided by the City Charter, the defendants had until August 9, 2005, 180 days from the date on which the petitions were issued, to file signed petitions with the City Clerk's Office. The defendants submitted their signed petitions on August 9, 2005, and the City Clerk's Office verified that the petitions contained a sufficient number of signatures to place the initiatives on the ballot.

The City Charter provides that initiated matters, after review and certification by the City Clerk, are to be submitted to the City Council. Colo. Springs Charter 12–40. The City Charter further provides that, upon submission, the City Council must either adopt the proposed ordinance or place it on the ballot. The City Council did neither in this case. Instead, it declined to place any initiatives on the ballot and filed this declaratory judgment action seeking a determination that the initiatives were improper and not subject to the initiative process, and an order that they not be placed on the ballot.

The City moved for summary judgment. The trial court denied the City's motion and entered summary judgment for the defendants. In a later order clarifying its summary judgment order, the trial court characterized its order as one in the nature of mandamus because it ordered the City to

place the initiatives on the November 7, 2006 ballot.

We review a grant of summary judgment de novo. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294 (Colo.2003).

## I. The People's Power to Legislate

The Colorado Constitution provides that "[a]ll political power is vested and derived from the people," and "all government ... originates from the people." Colo. Const. art. II, § 1. From this power, the people have reserved for themselves the power to legislate by way of initiative and referendum at both the state and municipal levels. Colo. Const. art. V, § 1. The citizens of Colorado Springs have also reserved initiative and referendum powers in the City Charter. Colo. Springs Charter 12–10(a)–(b).

■ State and local government officials may not prohibit the people from exercising their initiative powers by concluding that the initiated ordinance lacks merit or by declaring that the measure violates the state or federal constitution before the process has run its course and the measure is actually adopted. *McKee v. City of Louisville,* 200 Colo. 525, 616 P.2d 969 (1980).

These principles will guide our inquiry and analysis.

## II. Jurisdiction

The defendants assert we lack jurisdiction to address the issues because the election has not yet taken place and because there is no final and appealable order. We disagree with both assertions.

### A. Declaratory Judgment

■ Declaratory judgment proceedings are not intended to address speculative inquiries or uncertain or hypothetical questions. *Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP,* 45 P.3d 693 (Colo. 2002). A trial court has jurisdiction in such actions "only if the case contains a currently justiciable issue or an existing legal controversy, rather than the mere possibility of a future claim." *Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP,* supra, 45 P.3d at 698. Absent such an issue or controversy, a court may not render a declaratory judgment. *Cacioppo v. Eagle County Sch. Dist. Re–50J,* 92 P.3d 453 (Colo.2004).

Here, the City's action sought a pre-election declaratory judgment on the issue of whether the two initiatives should properly be submitted to the electorate, alleging that portions of each address administrative and not legislative matters, and contradict the City Charter. The City also alleged that the spending initiative contains matters that are other than local, special, or municipal. The City requested an injunction enjoining the two initiatives from being placed on any ballot.

### B. Pre-election Review

■ Despite the vesting of political power in the people and their reservation of the initiative and referendum powers in the constitution and city charters, it is well settled that the constitution does not reserve to the people the right to exercise executive or administrative power. As a result, an initiative may be subjected to preelection judicial review to determine whether it seeks to exercise administrative power and, consequently, is not an exercise of the constitutional right to legislate by way of an initiative. Accordingly, the supreme court has held that the people's right to legislate through the initiative process is not infringed upon by a judicial review or by a judicial declaration that a ballot initiative is administrative, not legislative, in character. *City of Idaho Springs v. Blackwell,* 731 P.2d 1250 (Colo.1987).

■ Therefore, the initiatives here are subject to preelection review to determine the narrow issue of whether they are administrative in nature and not the proper subject for an initiative.

### C. Finality

■ The Court of Appeals has initial jurisdiction over appeals from final judgments of the district courts. Section 13–4–102(1), C.R.S.2005; C.A.R. 1(a)(1). "A final judgment is defined as one which ends the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the

rights of the parties involved in the proceeding." *Stillings v. Davis,* 158 Colo. 308, 310, 406 P.2d 337, 338 (1965).

■ Subject to the requirement of finality, an appeal may be brought from an order that denied summary judgment to the moving party and awarded summary judgment to the opposing party. *In re Estate of Scott,* 119 P.3d 511 (Colo.App.2004), *aff'd,* 136 P.3d 892 (Colo.2006).

■ Here, the City filed a motion for summary judgment and the defendants responded, asking, inter alia, that the court "order that this matter be placed on the November 2006 election ballot." The trial court properly concluded that it had jurisdiction only to determine whether the initiatives are legislative or administrative in nature and declared that, while some matters may be administrative in nature, "the two initiatives contain proper matters to be placed before the public in the form of ballot measures." The trial court found that:

(1) the initiatives constitute a permanent change in the way the City would conduct much of its fiscal business, and, therefore, are mostly legislative;

(2) the citizens of this state have reserved to themselves the right to legislate with regard to certain matters, including raising revenue and spending; and

(3) the court should not interfere, at least at this stage, with the process of determining whether the City's taxpayers will approve of such major changes in fiscal policy.

Because the case concerns the right of citizens to legislate through referendum and initiative, the trial court explained that it was obligated to ensure that the City's failure to place the initiatives on the ballot did not unreasonably restrict the citizens' rights. The trial court further explained that the City had a clear obligation under the Colo. Springs Charter 12–60(2) to place the two initiatives on the ballot. Consequently, to ensure "the expeditious exercise of the people's legislative power that the case law mandates," the court ordered the City to place the two initiatives on the ballot in November 2006. It then explicitly denied the City's

third claim for relief, which sought a preliminary injunction.

Based on the foregoing, we conclude that the court's order granting summary judgment in favor of the defendants and ordering that the initiative be placed on the November 7, 2006, ballot fully resolved the City's claims for a declaration that the initiatives are not proper and for an order directing that they not be placed on the ballot.

The trial court also concluded that it retained jurisdiction over the City's assertions that the initiatives contradict the City Charter and that portions of the spending initiative are not local, special, or municipal. However, as to these claims, the trial court correctly concluded that prior to the adoption of the initiatives at an election, those questions were merely "hypothetical" or "contingent," that the declarations of rights sought by the City would merely be in the nature of "advisory" opinions until an initiative was approved by the electorate.

The trial court having so concluded, it is apparent that these issues were not then, and are not now, justiciable or the proper subject of a preelection declaratory judgment action. Declaratory judgment proceedings are not intended to address speculative inquiries, or uncertain or hypothetical questions. *Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP, supra; Cacioppo v. Eagle County Sch. Dist. Re–50J, supra.*

Hence, we conclude as a result of the grant of summary judgment and mandamus relief to the defendants, there is no currently justiciable issue or existing legal controversy before the district court. Thus, the grant of summary judgment in favor of the defendants left nothing further for the court to do to completely determine the rights of the parties at this time. Therefore, we conclude that court entered a final judgment which is subject to review under C.A.R. 1.

### III. Legislative or Administrative Provisions

We now turn to the law governing to the City's contentions that the initiatives contain provisions that are administrative in nature.

Under Colorado case law, a proposed ordinance's classification as administrative or legislative is largely an ad hoc determination. *City of Idaho Springs v. Blackwell, supra.* The term "ad hoc," in this context means "for the particular end or purpose at hand and without reference to wider application or employment." *Webster's Third New International Dictionary* 26 (2002). In determining whether a proposed ordinance should be classified as legislative or administrative, "[t]he central inquiry is whether the proposed legislation announces new public policy or is simply the implementation of a previously declared policy." *City of Idaho Springs v. Blackwell, supra*, 731 P.2d at 1254.

Two tests have been developed to guide this inquiry. First, "actions that relate to subjects of a permanent or general character are legislative, while those that are temporary in operation and effect are not." *Witcher v. Canon City,* 716 P.2d 445, 449 (Colo.1986). Second, "acts that are necessary to carry out existing legislative policies and purposes or which are properly characterized as executive are deemed to be administrative, while acts constituting a declaration of public policy are deemed to be legislative." *City of Aurora v. Zwerdlinger,* 194 Colo. 192, 196, 571 P.2d 1074, 1077 (1977). Charter provisions, ordinances, policies, and administrative practices all have some degree of permanence.

With respect to permanence, our supreme court stated in *City of Idaho Springs v. Blackwell,* as follows:

> In our view, the selection of the site and structure for the city hall is not a permanent or general act within the meaning of *Witcher* or *Zwerdlinger.* The structure is of course permanent in the sense that it will serve as the city hall for an indefinite period of time. However, the duration of legislation or the anticipated useful life of a municipal improvement does not completely determine the meaning of permanence when determining whether an ordinance is legislative or administrative. *See, e.g., Witcher,* 716 P.2d at 450 (city council's act in amending a lease between the city and the operators of the Royal Gorge bridge

> was administrative and not subject to referendum, despite the fact that the lease amendment extended the useful life of the bridge until the year 2032). The term "permanent" is used to signify a declaration of public policy of general applicability because a permanent enactment is more likely to involve policy considerations. *See Margolis v. District Court,* 638 P.2d [297, 304 (Colo.1981) ] ("It cannot be disputed that large rezonings ... *are general and permanent in character and involve a general rule or policy.")* (Emphasis added.)

*City of Idaho Springs v. Blackwell, supra,* 731 P.2d at 1254.

## IV. City Charter

As pertinent here, and in addition to the constitutional and City Charter provisions already described, the Charter generally provides as follows.

Since 1909, Colorado Springs has been a home rule city. Colo. Const. art. XX, §§ 5, 6. Its governing document is the Charter of the City of Colorado Springs. It has adopted the Council–City Manager form of government. Colo. Springs Charter 1–30.

Except as limited by the Charter or otherwise provided by law, the City Council is vested with "all powers." The City Council is required to establish annual, prioritized policy goals after consideration of public input and comprehensive plans. Colo. Springs Charter 3–10.

The Charter authorizes the City to own and operate water, waste water, electric light and power, gas, and other utilities. Colo. Springs Charter 6–20. The City Council shall constitute the board of directors of the utilities and shall, by ordinance or resolution, "establish rates and rules and regulations and extension policies for the services provided by Utilities." Colo. Springs Charter 6–70.

The Charter also limits the power of the City Council, officers, and employees to obligate the City to expend funds that are not appropriated. The Charter provides that, with the exception of bonded indebtedness and certain unforeseen contingencies such as accidents, the power is limited as follows:

Neither the Council nor any administrative officer or employee of the City shall have the authority to make any contract involving the expenditure of public money, or impose upon the City any liability to pay money, unless and until a definite amount of money shall have been appropriated for the liquidation of all pecuniary liability of the City under such contract or in consequence thereof to mature during the period covered by the appropriation. Such contract shall be *ab initio* null and void as to the City for any other or further liability....

Colo. Springs Charter 7–60.

### V. Revenue Initiative

 The City contends that the revenue initiative relating to the street light charges is administrative. We agree.

The revenue initiative provides:

[1] The property tax in tax year 2006 shall be four mills, and thereafter phased out one mill or more yearly. [2] All street light charges after 2002 shall be refunded by March 1, 2006 and shall end by that date. [3] Starting January 1, 2008, the 2% general sales tax shall adjust to 1.75% in five equal yearly steps. [4] All excess revenue shall be refunded to taxpayers yearly. [5] This ordinance shall be strictly enforced. These voter-approved revenue changes shall be in addition to any other tax cut or revenue reduction or refund, and may be delayed only as needed for current general fund revenue to increase yearly by future inflation. This ordinance shall be amended, superseded, or repealed only at a November election by voter-approved petitions. All relevant current provisions of section 7–90 of the city charter and Article X, section 20 of the state constitution shall apply to this ordinance.

For convenience, we have numerically divided the initiative into its various provisions. The defendants have not acquiesced in the delineation of the provisions.

The provision in question here states: "All street light charges after 2002 shall be refunded by March 1, 2006 and shall end by that date."

In November 2002, the City Council passed an ordinance requiring its electric utility to charge its residential and commercial customers a street light fee. The ordinance provided:

Utilities is authorized and directed to assess and collect a service charge, denominated as the Street Lighting Service Charge, from all residential and nonresidential customers within the City of Colorado Springs. The revenues received from the Street Lighting Charge shall be sufficient to defray the costs of street lighting service within the City of Colorado Springs, such costs to include the operations and maintenance expenses, inclusive of power consumption, and all capital costs associated with arterial and residential street lighting infrastructure not recovered through Section 7.7.801 of the City Code.

Colorado Springs Rev. Mun.Code 02203.

The fee was unsuccessfully challenged as a tax in *Bruce v. City of Colorado Springs*, 131 P.3d 1187 (Colo.App.2005).

We have already stated that the issue of whether the initiated ordinance conflicts with the Charter is not before us. However, in our view, we may consult the Charter in determining whether an act is legislative or administrative. The Charter authorizes the City to own and operate utilities, including an electrical utility. Colo. Springs Charter 6–20. The City Council constitutes the board of directors of the utility and may, by ordinance or resolution, establish rates and rules and regulations and extension policies for the services provided by utilities. Colo. Springs Charter 6–40(a), 6–70.

Under the rationale of *City of Aurora v. Zwerdlinger, supra*, setting rates or rate structures carries out existing legislative policies and is therefore characterized as administrative. In discussing the administrative-legislative distinction as it regards utilities, the court quoted with agreement from *Whitehead v. H & C Development Corp.*, 204 Va. 144, 151, 129 S.E.2d 691, 696 (1963), stating:

The successful operation of a public utility is a business proposition involving the exercise of discretion and good judgment in

management. Expenses incident and essential to proper operation are necessarily based on the cost of labor, material and other factors at the time the services are rendered. They are of such a fluctuating nature, due to economic and other temporary conditions, as to make it impractical, if not impossible, for the general public to appraise them in the absence of specific data, facts and information necessary to arrive at a fair and accurate judgment upon the subject. The changing expense factor goes to the very heart of the operation. . . .

While the establishment of the city-owned water system may have been in pursuance of a broad public policy and, therefore, a legislative matter, the receipts and expenses incidental to its maintenance and management are executive or administrative matters. It is clear that the provisions of the proposed ordinance of the electors are merely temporary in operation and effect. The ordinance does not propose to make a new law; it is one executing a law already in existence, merely changing an expense factor in the maintenance of a public utility. It pursues no new policy. It pursues a plan already adopted by the city council. Judged by these tests, it is administrative rather than legislative.

*City of Aurora v. Zwerdlinger, supra,* 194 Colo. at 197, 571 P.2d at 1077.

The revenue initiative's street light provision would require the refund of the street lighting service charge by March 1, 2006. According to the defendants, that refund would be approximately $14 million payable, presumably, from the electric utility which charged and collected it. However, an initiative that is retrospective in nature, and calls for a refund of revenues collected by a utility in prior fiscal years, is not a declaration of public policy of general applicability. *City of Aurora v. Zwerdlinger, supra; Witcher v. Canon City, supra.*

In addition to requiring the refund of the street light service charge, the provision also states that the charge "shall end by [March 1, 2006]." Nonetheless, the defendants contend, and the City does not dispute, that,

effective July 28, 2006, the City repealed the street light service charge that would be repealed by the initiative. As previously stated, City Charter 12–60(a)(2) provides that, upon submission, the City Council must either adopt the proposed ordinance or place it on the ballot. Here, the City has implemented the initiative's street light service charge termination requirement. Although the City repealed the service charge four months after the date provided for in the initiative, both dates have already passed.

Therefore, because we have concluded that the provision requiring refund of the street light service charge is administrative in nature, that the refund requirement was tied to the termination requirement, that the date for the proposed termination has passed, and that the service charge has already been terminated, the street light provision is not legislative and, thus, is not a proper subject for an initiative.

## VI. Deficit Spending Initiative

The City also contends that some provisions of the "deficit spending" initiative are administrative in nature. We agree in part.

The deficit spending initiative provides:

*Deficit Spending.* [1] Future non-enterprise city financial obligations that continue after the year created shall not exceed ten years. Each shall require voter approval of a separate petition at a November election. Total payments due during all such future financial obligations combined shall not exceed ten percent of the taxable valuation for assessment of taxable real property in the city. [2] Starting January 2006, all current certificates of participation shall be paid off in no more than five equal yearly payments. [3] Starting January 2007, and without using intergovernmental revenue, the city shall reserve yearly three percent or more of its fiscal year spending in an interest-bearing fund, with principal and interest to be used only to buy city capital improvements for cash. The city shall fully deplete that fund before incurring such future financial obligations. "Capital improvements" means real property and affixed construction with a useful life exceeding 25 years, but not

such financial obligations, maintenance, or city payroll costs. [4] "City" also includes any city-related authority or other non-enterprise entity. "Financial obligations" includes certificates of participation, leases, capital leases, lease-purchases, bonds, mortgages, debts, notes, contracts, employment and severance agreements, vacation and sick pay, and all other non-pension monetary liabilities *whatsoever*, whether or not future payments are contingent, subject to annual appropriation, or made directly or indirectly, unless the full amount owed for all future payments is irrevocably pledged and held in cash. This ordinance shall not impair any lawful existing contract and shall be strictly enforced. This ordinance shall be amended, superseded, or repealed only at a November election by voter-approved petitions. All relevant current provisions of section 7–90 of the city charter and Article X, section 20 of the state constitution shall apply to this ordinance.

(Emphasis in original.)

Again, for convenience purposes, we have inserted numbers to delineate the various provisions in the initiative. Also, the defendants have not acquiesced in the delineation of these provisions.

### A. Multi–Year Contracts

■ First, the City contends that the provision, which requires that all multi-fiscal year contracts be fully funded in cash at the outset or submitted to the voters, regulates administrative matters. The provision states:

Future non-enterprise city financial obligations that continue after the year created shall not exceed ten years. Each shall require voter approval of a separate petition at a November election. Total payments due during all such future financial obligations combined shall not exceed ten percent of the taxable valuation for assessment of taxable property in the city.

Here, the term "financial obligation" is broadly defined in the proposed ordinance, and the definition contains additional limitations. The definition states:

"Financial obligations" includes certificates of participation, leases, capital leases, lease-purchases, bonds, mortgages, debts, notes, contracts, employment and severance agreements, vacation and sick pay, and all other non-pension monetary liabilities *whatsoever*, whether or not future payments are contingent, subject to annual appropriation, or made directly or indirectly, unless the full amount owed for all future payments is irrevocably pledged and held in cash.

(Emphasis in original.)

As such, in combination, the provision would require nonenterprise City operations either (1) not to enter into multi-year contracts; (2) to fund fully with irrevocably pledged funds all future payments of multi-year contracts; or (3) to submit unfunded multi-year contracts to the voters for approval.

Multi-year agreements frequently contemplate that the governmental entity will appropriate funds in future fiscal years without obligating the entity to do so. The agreements provide that any payment in future fiscal years is subject to funds being appropriated, or otherwise made available, for that purpose.

In *Board of County Commissioners v. Dougherty, Dawkins, Strand & Bigelow, Inc.*, 890 P.2d 199, 207 (Colo.App.1994), *overruled on other grounds In re Submission of Interrogatories on House Bill 99–1325*, 979 P.2d 549 (Colo.1999), a division of this court held that certificates of participation which require future annual appropriations "do[ ] not create a 'debt' or 'other financial obligation' in any future year because [they do] not require funds to be appropriated for that purpose, nor [do they] obligate future commissioners to tax for that purpose." The City budgets annually; therefore, at any given time, it has no appropriated funds beyond the current fiscal year.

The provision, by definition, includes multi-year employment contracts for exempt employees; severance agreements; service agreements for equipment; contracts for outside professional services; lease agreements for office, storage, or parking space; and requirement contracts for supplies all of

which are embraced by its expansive definition. This broad scope is indicative of a general policy matter, rather than a narrow administrative one.

The provision also addresses some matters that have been historically viewed as legislative, such as the issuance of general obligation bonds for which an election is already required, Colo. Const. art. XI, § 4, and some matters which have historically been considered administrative, such as the leasing of real property. *See Witcher v. Canon City, supra* (city as landlord); *Glennon Heights, Inc. v. Cent. Bank & Trust,* 658 P.2d 872 (Colo.1983) (multi-year lease requiring annual renewal is a discretionary or contingent obligation and not constitutional debt).

The City argues that these contracts, which are relatively short in duration, do not create a new permanent and general policy but merely implement existing policy. One City official submitted an affidavit stating:

> These leases, contracts, agreements, etc. can be as small as a few hundred dollars or as large as several million dollars. Through the course of a year, literally hundreds of these financial commitments are entered into.... These financial commitments do not set policy, but rather are necessary to carry out the policy of the City.... Therefore, these financial commitments are not of general applicability, which declare a public policy, but rather apply specifically to a particular subject, which involves the carrying out of a policy.

However, in our view, the City's argument misses the point. While these contracting practices may be, or have been, administrative, the initiative at issue creates a new permanent and general policy limiting or eliminating the City's ability to enter into a certain class of contracts. The initiative proposes a policy that, regardless of any benefit or flexibility afforded the City by its current practices, limits multi-year contracts to those which are fully funded or which are approved by a vote of the City's electorate.

We therefore conclude that the provision creates a general and permanent policy which is the proper subject of an initiative.

### B. Retirement of Current Certificates of Participation

■ We next address the City's contention that the provision of the "deficit spending" initiative that "[s]tarting January 2006, all current certificates of participation shall be paid off in no more than five equal yearly payments," is administrative in nature and not the proper subject of an initiative. We agree.

This provision, like the refund of the street lighting fee, does not create a new permanent policy. Instead it merely requires the City Council to act in a certain manner, that is, to pay off currently outstanding certificates of participation. The provision requires that the certificates of participation be paid even if continuing with them in accordance with their terms would be in the best interests of the City or in accordance with the policies of the City.

We, therefore, conclude that the provision requiring that all current certificates of participation be paid off in no more than five equal yearly payments is an administrative decision not proper for an initiative.

### VII. Remedy

■ Because we hold that both proposed ordinances contain provisions which are not proper subjects for an initiative, we must address the appropriate remedy. We conclude that the administrative matters may be severed from the balance of the initiatives.

The City, relying on *Margolis v. District Court, supra; Witcher v. Canon City, supra;* and *City of Aurora v. Zwerdlinger, supra,* argues that if an initiative contains any administrative matters, it cannot be submitted to the voters. However, in each of the cases cited, the initiative contained only one subject, for example, the construction of a city hall.

The defendants argue that the appropriate remedy is to sever any administrative matter and submit the balance to the voters. The defendants state that the severability clauses in the Charter and the Colorado Constitution permit severance. *See* Colo. Const. art. 10, § 20; Colo. Springs Charter 70–90(a). This severability language, however, applies only

to those articles; they are not general severability provisions. Thus, they have no application here.

Our supreme court in *Bickel v. City of Boulder,* 885 P.2d 215 (Colo.1994), dealt with a post-election challenge by citizens and taxpayers against the City of Boulder and other entities, seeking declaratory and injunctive relief and the invalidation of several ballot issues relating to the issuance of general obligation and revenue bonds adopted by the electorate at the November 2, 1993, general election. The plaintiffs there claimed that the ballot descriptions violated several provisions of article X, § 20 of the Colorado Constitution. Each of the entities submitted one or more proposals, each being independent of the other as to the purpose, the amount borrowed, and the terms.

One proposal by the City of Boulder involved the purchase of open space with the proceeds of revenue bonds which were to be repaid from sales and use taxes and ad valorem property taxes. The constitution required that any increase in taxes be quantified in the ballot title, and the use of ad valorem property tax was not quantified. Instead, the ballot title stated that the increase would be "in an amount sufficient to pay the principal of and interest on such bonds and refunding bonds."

The court, without analysis, ordered that the ad valorem property tax funding be severed from the balance of the bond proposal:

> In summary, the language in [the] City [proposal] referring to a proposed increase in ad valorem property taxes "in any year in an amount sufficient to pay the principal of and interest on such bonds and refunding bonds when due" is ineffective and must be severed from [the] remainder of that measure. All other provisions in the City [proposal], however, are valid and enforceable as adopted by the electorate.

*Bickel v. City of Boulder, supra,* 885 P.2d at 237.

However, *Bickel* is distinguishable as it dealt with a post-election challenge to an initiative proposed by the city council. Here, we are considering a preelection challenge to an initiative proposed by private citizens.

In *McAlpine v. University of Alaska,* 762 P.2d 81 (Alaska 1988), which also permitted severance, the court noted that judicial exercise of the power to sever impermissible portions of a proposed ordinance would promote the people's right to enact laws through the initiative process. The court reasoned that initiatives are largely a product of grassroots activists with limited resources, and striking an entire initiative based on flawed provisions would cost significant time and money on the part of the proponents and thereby impede the ability of the people to initiate laws. As a result, the reviewing court should sever an impermissible portion of an initiative if the following conditions are met:

> (1) standing alone, the remainder of the proposed bill can be given legal effect; (2) deleting the impermissible portion would not substantially change the spirit of the measure; and (3) it is evident from the content of the measure and the circumstances surrounding its proposal that the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety.

*McAlpine v. Univ. of Alaska, supra,* 762 P.2d at 94–95 (footnote omitted). *But see Bennett v. Drullard,* 27 Cal.App. 180, 149 P. 368 (1915); *State ex rel. Hazelwood Yellow Ribbon Comm. v. Klos,* 35 S.W.3d 457 (Mo.Ct.App.2000)(severance is not permitted because it is difficult to ascertain the intent and motivation of those who signed the petition).

Applying *Bickel v. City of Boulder, supra,* and incorporating the standards of *McAlpine v. University of Alaska, supra,* we conclude that the provisions of the initiatives that relate to administrative matters are severable.

Therefore, the "deficit spending" initiative submitted to the City electorate on November 7, 2006, shall read as follows:

> Future non-enterprise city financial obligations that continue after the year created shall not exceed ten years. Each shall require voter approval of a separate petition at a November election. Total payments due during all such future financial obligations combined shall not exceed ten

percent of the taxable valuation for assessment of taxable property in the city. Starting January 2007, and without using intergovernmental revenue, the city shall reserve yearly three percent or more of its fiscal year spending in an interest bearing fund with principal and interest to be used only to buy city capital improvements for cash. The city shall fully deplete that fund before incurring such future financial obligations. "Capital improvements" means real property and affixed construction with a useful life exceeding 25 years, but not such financial obligations, maintenance, or city payroll costs. "City" also includes any city-related authority or other non-enterprise entity. "Financial obligations" includes certificates of participation, leases, capital leases, lease-purchases, bonds, mortgages, debts, notes, contracts, employment and severance agreements, vacation and sick pay, and all other non-pension monetary liabilities *whatsoever*, whether or not future payments are contingent, subject to annual appropriation, or made directly or indirectly, unless the full amount owed for all future payments is irrevocably pledged and held in cash. This ordinance shall not impair any lawful existing contract and shall be strictly enforced. This ordinance shall be amended, superseded, or repealed only at a November election by voter-approved petitions. All relevant current provisions of section 7–90 of the city charter and Article X, section 20 of the state constitution shall apply to this ordinance.

Further, the revenue initiative submitted to the City electorate at the general election on November 7, 2006, shall read as follows:

The property tax in tax year 2006 shall be four mills, and thereafter phased out one mill or more yearly. Starting January 1, 2008, the 2% general sales tax shall adjust to 1.75% in five equal yearly steps. All excess revenue shall be refunded to taxpayers yearly. This ordinance shall be strictly enforced. These voter-approved revenue changes shall be in addition to any other tax cut or revenue reduction or refund, and may be delayed only as needed for current general fund revenue to increase yearly by future inflation. This

ordinance shall be amended, superseded, or repealed only at a November election by voter-approved petitions. All relevant current provisions of section 7–90 of the city charter and Article X, section 20 of the state constitution shall apply to this ordinance.

Because both initiatives were originally proposed for the November 1, 2005 election, or a special election in accordance with the City Charter, they were to take effect in tax, fiscal, or calendar year 2006. Despite the fact that the election will not occur until November 7, 2006, neither party has raised any issue regarding this incongruity, and we decline to address it.

## VIII. Conclusion

Therefore, the order of the trial court is reversed to the extent that the administrative provisions identified above must be excised from the initiatives, and the case is remanded to the trial court to order the City to place the initiatives, as herein amended, on the ballot for the general election to be held on November 7, 2006. In all other respects, the order is affirmed.

Finally, time is of the essence. We note that it is not necessary for a party to file a petition for rehearing prior to seeking a writ of certiorari in the supreme court. C.A.R. 52(b)(1). Therefore, while we would appreciate either party notifying us of any scrivener's error in our statement of the final ballot provisions, we strongly encourage any party seeking further review to petition the supreme court for a writ of certiorari within the time permitted by the applicable appellate rule. In the event no petition for a writ of certiorari is timely filed with the supreme court, the clerk of this court is directed to issue a mandate at the earliest possible time authorized by the applicable appellate rule.

Judge DAILEY and Judge CARPARELLI concur.